Argued October 25, affirmed December 26, 1978

PACIFIC NORTHWEST BELL TELEPHONE
COMPANY, *Petitioner,*

*v.*

EMPLOYMENT DIVISION et al, *Respondents.*

(No. 78-AB-530, CA 11297)

588 P2d 654

Jonathan T. Harnish, Portland, argued the cause for petitioner. With him on the brief was Bullard, Korshoj & Smith, P.C., Portland.

Jeffrey S. Mutnick, Portland, argued the cause for respondent Sandra P. Vaughn. With him on the brief was Pozzi, Wilson, Atchison, Kahn & O'Leary, Portland.

No appearance for respondent Employment Division.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Employer appeals an order of the Employment Appeals Board which affirmed a referee's allowance of unemployment benefits to claimant. *See* ORS 657.282, 183.480 *et seq.* The primary issue is whether the Board erred as a matter of law in ruling that claimant was not discharged for misconduct connected with her work and so was not subject to the disqualification of ORS 657.176(2)(a).

On August 30, 1977, claimant suffered an on-the-job back injury. Two days later, while off the job, she sustained a knee injury, which she claimed was caused by the back injury. When the employer denied responsibility for the second injury, claimant secured counsel to represent her on her workers' compensation claim. Claimant remained off the job from the date of the initial injury. On November 4, 1977, she came under the care of Dr. Coletti, an orthopedic specialist. After examining claimant on November 16, Dr. Coletti reported to employer that claimant probably had no permanent disability, but would need further treatment. He estimated that she would be able to return to work in "several weeks."

On November 21, 1977, claimant was examined by Dr. Williams, a member of employer's in-house medical staff. In a report dated December 1, Dr. Williams recognized that claimant was under the care of Dr. Coletti, but concluded:

> "I feel that [claimant's] total health would be benefited if she returned to work at this time in a sedentary job where she is allowed some freedom to change positions from time to time. No doubt she will have some back discomfort, but I feel this is the best medical therapy for the lady at this time."

He recommended that she return to some work requiring no prolonged standing, walking, kneeling or lifting of weights over 15 pounds.

[ 845 ]

On December 8, 1977, claimant's supervisor went to her home. At that time he told her

> "we had a position open for her, and—the same job, and that she—according to the medical—this medical report—the doctor felt that it would be—it would be good therapy for her to come back to work * * *."

He described three types of work activity in her department which, judging from Dr. Williams' report, she would be able to perform. Claimant said she would need a written description of the proposed job activities to give to her doctor before she could return to work. Instead, the supervisor verbally explained the lighter work he had in mind. After he left, she called Dr. Coletti and related her conversation with the supervisor. Dr. Coletti advised her that she should not return to work. Later that day claimant obtained from his office a note which stated only that she was "to be off work thru 1 Jan 78."

According to claimant, she called her supervisor at approximately 4 p.m. on December 8 and told him that Dr. Coletti had advised her not to return to work. The supervisor denied that conversation. The referee, however, found that it had occurred and we are bound by that finding. ORS 183.482(7). The supervisor did recall a telephone conversation with claimant on the morning of December 8, just after he returned to his office from the home visit. She asked if it would be considered insubordination if she did not report to work. The supervisor told her that he had not said anything to her at her home about insubordination but had only described the available job.

About a week later claimant went to the employer's premises to fill out a form. Nothing was said at that time, or at any other time prior to her discharge in late January, about her earlier failure to report to work.

On December 15, Dr. Christopherson, another member of employer's medical staff, submitted a report based solely on the written reports of Dr. Coletti and Dr. Williams. He reiterated that there was no

reason why claimant could not have returned to light duty anytime after December 1. Dr. Christopherson's conclusion was based largely on the fact that when Dr. Coletti examined claimant

> "on November 16 (a month ago) he felt she could probably be recovered after 'several weeks.' "

Based on Dr. Christopherson's report, employer's district manager recommended discontinuance of claimant's company sick benefits and requested claimant to undergo another examination by the employer's medical personnel. On the advice of counsel representing her in the workers' compensation matter, claimant refused to submit to the examination.

On December 21, employer ordered an investigation of defendant by a private investigation firm. On December 30, an investigator made films of claimant engaged in various physical activities, including driving, bending, running, lifting an ice chest and throwing sticks for her dog, all while on a day trip to the coast. Those films were apparently not received by employer until mid- to late January.

On January 24, 1978, employer received a certificate from Dr. Coletti stating that he had last examined claimant December 23, 1977, and had concluded that her back sprain would prevent her from returning until about the first week of February. On January 24, 1978, employer discontinued claimant's sick pay; on January 26 it terminated her employment. Both actions were retroactive to December 30. The letter notifying claimant of her discharge did not specify any reasons.

On February 2, Dr. Coletti released claimant to return to work, with lifting restricted to 25 pounds or less. In a report submitted that day to the Division, he stated that claimant had been unable to work from August 31, 1977, to February 2, 1978, because of the back sprain.

Employer's representatives who testified in this case had difficulty identifying the alleged misconduct with specificity. The district manager who made the decision to discharge claimant suggested that a variety of considerations may have been involved in that decision, including employer's difficulty in securing information concerning claimant's physicial condition. That difficulty apparently resulted from claimant's attorney's having advised Dr. Coletti not to release information to anyone without his approval.

The primary claim of misconduct, however, was that claimant misrepresented her physical condition by failing to return to work after December 8. A company rule specifically prohibited the misrepresentation of the reason for absence from work; another rule mandated "fundamental honesty." The district manager testified as follows:

> "Well I considered the fact—in my opinion at any rate—that she was misrepresenting her condition, her physical condition * * * 12/9/77 after the visit and, and when she failed to report to work."

In response to questions by claimant's attorney the district manager further testified:

> "Q: Now, is the reason that Ms. Vaughn was terminated, because she failed to return to work when your company felt that she should have, is that the reason?
> "A: The basic reason, yes.
> "Q: Ms. Vaughn was terminated because you believed that she could have returned to work, at least modified employment, some time after the 8th of December, is that correct?
> "A: That's correct."

The initial administrative decision of the Employment Division was that claimant was not discharged for misconduct in connection with her work and was eligible for unemployment compensation. That determination was based on the report of Dr. Coletti that claimant was not able to work until February 2, 1978.

Employer requested a hearing. The referee also

concluded that there had been no proof of misconduct to disqualify claimant. His opinion stated in part:

"If the employer thought the claimant's failure to accept the light-duty work offer on December 8, 1977 was a serious matter, it would seem that at the very least, they might have told her so. Certainly they could have written her a letter, stating she should return by a certain date, or present medical evidence showing that she could not, or else, she would be considered as having abandoned the job. However, it cannot be deduced from the employer's testimony that they at any time gave her any indication she might be terminated because she did not return on December 9, 1977. The claimant's testimony shows that she did not return because she relied on the advice of her treating physician, a specialist. It might reasonably be anticipated that the claimant would place more faith in her own physician, when he is a specialist and the one most familiar with her condition, rather than a doctor who had not treated her. Consequently, her failure to accept the offer of light-duty work cannot be construed as an intentional disregard of the employer's interest. She was only following the advice of her physician that she should not yet try to return to work.

"The employer also implied that the claimant was discharged because she was dishonest. In what manner the claimant was allegedly dishonest was never shown, but apparently the employer would have the referee assume that she was dishonest because she may have been physically able to return to work. However, it was not suggested that it was the claimant, rather than her doctor, who decided she was not physically able to return, and it is inconceivable that the claimant's doctor, especially in view of the medical reports already in the record, would say that he instructed her to return to work on December 9, 1977. There may be an honest difference of opinion as to whether the claimant was able to work, but that is a proper question for another forum. The difference of opinion concerning the claimant's health in no way connotes misconduct."

The Employment Appeals Board affirmed the referee's decision.

In *Geraths v. Employment Division,* 24 Or App 201, 204, 544 P2d 1066 (1976), we quoted with approval from 76 Am Jur 2d 945-47, § 52 (1975):

"[M]isconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has a right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer. * * * The statutory term 'misconduct' should not be so literally construed as to effect a forfeiture of benefits by an employee except in clear instances; rather, the term should be construed in a manner least favorable to working a forfeiture so as to minimize the penal character of the provision by excluding cases not clearly intended to be within the exception. * * *"

The burden is on an employer to establish by a preponderance of the evidence misconduct that would disqualify a claimant from the receipt of unemployment compensation. *Babcock v. Employment Div.,* 25 Or App 661, 550 P2d 1233 (1976). The referee and Board concluded that employer failed to meet that burden here. We agree.

Claimant's treating physician did not release her to return to work until February 2, 1978. Despite the opinions of the employer's medical staff, it was not misconduct for claimant to follow the orders of her treating physician. In its brief the employer has made vague suggestions that the claimant somehow misrepresented her condition to Dr. Coletti and that she was not acting in good faith reliance on his order to remain off work. The evidence does not support those suggestions. Although claimant engaged in various activities on December 30, activities seemingly consistent with ability to work, there was no evidence that Dr. Coletti would have changed his orders had he

known that she was able to do those things. That she did not report for work when and as employer would have had her do is proof neither of her ability to work nor that she misrepresented her condition.

■ Employer also assigns as error the referee's refusal to view the films made by the private investigator. Employer's request for a viewing of the films was made after the investigator had fully described the activities which they depicted. It was within the referee's discretion to reject a viewing of the films as unduly repetitious. OAR 471-40-025(5). Without a showing in the record that the films would have materially added to the witness' testimony, we cannot say that discretion was abused.

■■ Finally, employer argues that the referee erred in refusing to allow employer to call claimant as a witness in its case in chief or to cross-examine her beyond the scope of her direct examination. In essence the argument is that it was prejudiced by an improper restriction on the scope of its examination of claimant. The record does not establish what, if any, substantial rights were prejudiced by the referee's rulings. ORS 183.482(8)(a). Employer agreed to limit cross-examination to matters covered in the direct examination of claimant. Employer now argues that it agreed only because it was improperly given a Hobson's choice, *i.e.,* agree to limit the scope of cross-examination or claimant will not testify. If employer was truly presented with that choice (a matter we need not decide), it neither objected to being placed in that position nor gave any indication what other evidence it expected to elicit if an unlimited examination were allowed. In the circumstances we cannot say that it was prejudiced by the ruling.[1] Claimant did testify and was cross-examined. What the effect of the limitation was is neither apparent nor explained.

Affirmed.

---

[1] The ruling was erroneous. Although claimant had the choice to appear or not at a hearing (OAR 471-40-025(4)), neither she nor her counsel on her behalf had the right to prevent her being called as a witness.