RITA TUMA, APPELLANT, V. OMAHA PUBLIC POWER DISTRICT AND RONALD E. SORENSEN, NEBRASKA COMMISSIONER OF LABOR, APPELLEES.
409 N.W.2d 306

Filed July 17, 1987.    No. 86-102.

David R. Stickman of Stern, Swanson & Stickman, for appellant.

Thomas F. Hoarty, Jr., of Fraser, Stryker, Veach, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee Omaha Public Power District.

20

Laureen Van Norman, for appellee Sorensen.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

The claimant, Rita Tuma, appeals from an order of the district court for Douglas County affirming a decision of the Nebraska Department of Labor Appeal Tribunal. The tribunal had reversed an award by a department claims deputy awarding unemployment compensation benefits to claimant. The tribunal held that claimant's conduct constituted misconduct within the meaning of the Nebraska Employment Security Law, Neb. Rev. Stat. §§ 48-601 to 48-669 (Reissue 1984), sufficient to bar claimant from receiving unemployment compensation benefits until after a waiting period. Claimant had been terminated from her employment as a stenographer with Omaha Public Power District for misconduct. Claimant has appealed to this court, alleging as error "[t]he holding of the district court that Ms. Tuma's failure to provide a statement from her physician that Ms. Tuma should not immediately return to a smoke-filled work environment detrimental to her health constitutes misconduct in connection with the claimant's work justifying a disqualification from employment benefits . . . ."

Appeals under the provisions of §§ 48-601 to 48-669 are reviewed de novo on the record made in the district court. It is the duty of this court to retry the issues of fact involved in the findings complained of and to reach an independent conclusion. *Smith v. Sorensen,* 222 Neb. 599, 386 N.W.2d 5 (1986); *School Dist. No. 21 v. Ochoa,* 216 Neb. 191, 342 N.W.2d 665 (1984). Bearing this in mind, we must decide whether claimant's conduct constituted misconduct within the meaning of the Nebraska Employment Security Law. Pursuant to § 48-628(b) a claimant may be disqualified for benefits if he or she has been discharged for misconduct connected with his or her work. The term "misconduct" itself is not defined in the statute. This court has defined the term to include

" 'behavior which evidences (1) wanton and willful disregard of the employer's interests, (2) deliberate

violation of rules, (3) disregard of standards of behavior which the employer can rightfully expect from the employee, or (4) negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard of the employer's interests or of the employee's duties and obligations.' . . ."

*Smith v. Sorensen, supra* at 603, 386 N.W.2d at 8; *McCorison v. City of Lincoln*, 215 Neb. 474, 339 N.W.2d 294 (1983); *Stuart v. Omaha Porkers*, 213 Neb. 838, 331 N.W.2d 544 (1983).

The record shows that on June 4, 1984, claimant began working as a stenographer for appellee Omaha Public Power District (O.P.P.D.). At the time of trial, an examining physician's report of an examination in 1984 was introduced, showing that claimant had related to him "a history of rather severe hypersensitivity to cigarette smoke."

The claimant worked in an open office area. Before November 1, 1984, she worked at a desk in the middle of the area. In the area then were nine persons who smoked. A diagram of the room showed four smokers in the open area itself, somewhat near claimant's desk. On October 29, 1984, claimant first indicated to her supervisor that she was having problems caused by smoking in the office area. The supervisor referred the problem to the O.P.P.D. employee relations department. The supervisor and members of that department had a meeting and decided to move claimant's desk and create a nonsmoking area. They also discussed the situation with the building manager, who arranged for a check of the airflow in the office and the installation of an extra return air duct to pull air away from the area of claimant's desk. The supervisor informed claimant the next day that the company was working on the problem. The layout of the office where claimant worked was changed immediately.

After November 1, 1984, a nonsmoking area, consisting of about one-half of the office, was created, and claimant's desk was moved and located in that area. O.P.P.D. changed the positioning of desks in the open office area to allow claimant to have a desk as far away as possible from the other workers who smoked. The nearest smoker's desk was more than 20 feet from claimant's. No-smoking signs and an ashtray were placed near

the area where claimant worked. Airflow was checked. A cold-air duct was installed on December 5, 1984. The last date that claimant was in the work area was December 6, 1984.

On December 5, 1984, Tuma was seen by her doctor, Dr. Wallace E. Duff. He prescribed some antibiotics for her condition. The following day Tuma had her husband obtain a statement from the physician's office that recommended she remain away from work for a period of 10 days, and after delivering it to her supervisor, Joyce Finnell, she left work.

Subsequently, Finnell telephoned Tuma and told her that O.P.P.D. wanted her to see a physician of its choice. On December 10, 1984, claimant was examined by Dr. Ronald W. Olnhausen. Dr. Olnhausen reported to O.P.P.D.:

As long as she [Tuma] has symptoms from the exposure to cigarette smoke, she will probably not be able to work in surroundings in which there is a significant amount of exposure. The amount of exposure that she would tolerate could only be determined by trial and error. Certainly there is a pre-existing history of allergy and hypersensitivity which may be a predisposing factor in her current difficulties. It is my feeling that she could return to work immediately if she were in a smoke-free environment.

On December 17, 1984, Tuma again saw Dr. Duff. Claimant did not submit any report from Dr. Duff concerning this visit. Claimant did write a letter, dated December 17, 1984, which her O.P.P.D. supervisor received on December 26. In the letter claimant said that she had seen Dr. Duff on that day and that he advised her "that since there were still unhealed bleeding points and ulcerations and because there have been no steps taken to remedy the smoke pollution in the office area, I should not return to work for at least 4 weeks . . . ." In his deposition testimony, Dr. Duff testified that he did not even know if claimant worked in an office. Dr. Duff further testified that after his December 17, 1984, examination, he determined "by physical examination she was better and subjectively she seemed to be better." At the hearings on this matter, claimant submitted a note on Dr. Duff's stationery dated December 26, 1984, and apparently signed by a nurse, stating that claimant

should not return to work for 4 weeks. In Dr. Duff's testimony, however, he did not testify concerning any such recommendation. Dr. Duff testified that he did not remember a specific discussion with claimant on December 17, 1984, concerning her returning to work.

Tuma called Finnell and informed her that she could not return to work for an additional 4 weeks. On December 21, 1984, O.P.P.D. sent Tuma a letter, which she received on December 22 and which read as follows:

Dear Ms. Tuma:

The District has taken all necessary steps to provide a work environment which is in compliance with the Nebraska Clean Indoor Air Act and which provides you a safe and satisfactory work area.

Therefore, you are expected to be at work on Friday, December 28, at 8:00 a.m. In the event that you do not report for work as required herein, the District will conclude that you are no longer interested in retaining your position and that you have voluntarily terminated your employment.

The record shows the following medical letters received in evidence. On December 6, 1984, Dr. Duff wrote to claimant's personal doctor and to her attorney: "We do plan to follow her closely and will see if we can determine if, in fact, she can survive in the present atmosphere she is working in."

The physician who examined claimant on December 10, 1984, submitted a report stating in part:

As long as she [Tuma] has symptoms from the exposure to cigarette smoke, she will probably not be able to work in surroundings in which there is a significant amount of exposure. The amount of exposure that she would tolerate could only be determined by trial and error.

The evidence shows that O.P.P.D. was trying to furnish claimant a smoke-free area. As stated above, the office where claimant worked was changed so as to designate approximately one-half of the office as a nonsmoking area. An air duct was installed to withdraw the air near the smokers' desks, but claimant did not return to work at any time to determine its effect on the situation.

The record shows that claimant did not even attempt to work in the improved environment. The record also shows that claimant could work on the very day she was ordered to return to work at O.P.P.D. On that day, December 28, 1984, claimant filed a claim for unemployment benefits. Section 48-627(c) provides that a person receiving such benefits must be able to work and available for work. In her application for benefits, claimant answered the question, "Do you have any reasons which would prevent you from accepting immediate employment (i.e. . . . . health . . .) if so, explain," by saying, "no — as long as it was in a smoke free area." (Emphasis in original.)

We find that O.P.P.D. was attempting to furnish claimant a "smoke free area." Claimant did not choose to cooperate with her employer's efforts to keep her employed. Such an attitude demonstrates a complete disregard of the employer's interests in getting work done in a difficult situation for all concerned. Failure to cooperate with an employer which is attempting to furnish a smoke-free environment by a good faith trial and error method constitutes misconduct in connection with the employee's work sufficient to disqualify the employee from receiving unemployment compensation benefits.

Insofar as the district court found that claimant was guilty of misconduct in that she did not furnish medical information which she told O.P.P.D. substantiated the requirement that she remain off work for an additional 4 weeks after December 17, 1984, we also agree with the district court. Claimant informed her supervisor that she would furnish medical information from Dr. Duff. The facts, as set out above, show that claimant did not, at any time, have a report from Dr. Duff stating she should not return to work for 4 weeks after December 17, 1984. Claimant's letter of December 17, 1984, so stating, is not supported by any evidence from Dr. Duff.

We further determine, as did the district court, that failure to furnish medical justification for prolonged absences from employment, when an employee has stated that such justification will be furnished, constituted misconduct in connection with her work sufficient to justify a denial of unemployment compensation benefits. The decision of the

district court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I must vigorously dissent from the majority in this case. I do so because the majority opinion is wrong both as a matter of fact and as a matter of law. The majority has now concluded that an employee who refuses to let his or her employer experiment with the employee's health on a trial and error basis, albeit in good faith, is guilty of willful misconduct so as to deny the employee unemployment compensation benefits. It is, to me, significant that the majority is unable to cite any authority in support of that rule of law. I suspect that the majority's inability to do so is due to the fact that there is no precedent for such a rule. An employer may be entitled to ask an employee to "give all" in the sense of supporting the employer's work; it strikes me that it is too much to demand that the employee must likewise experiment with his or her health for the benefit of the employer.

This court has consistently held that the Employment Security Law is to be liberally construed in order that its beneficent purpose of paying benefits to involuntarily unemployed workers may be accomplished, see *Sorensen v. Meyer*, 220 Neb. 457, 370 N.W.2d 173 (1985), and further that these beneficent purposes are not served by a strained construction of the statutes which will deny an unemployed worker the benefits of the act. See *Hanlon v. Bodin*, 209 Neb. 169, 306 N.W.2d 858 (1981). Notwithstanding that fact, the majority, while ignoring the recognized rules of law, now holds that an employee who is unwilling to permit his or her employer to experiment with the employee's health is guilty of willful misconduct.

The question of what constitutes misconduct has been defined by this court. We have defined the term to include behavior which evidences

" '(1) wanton and willful disregard of the employer's interests, (2) deliberate violation of rules, (3) disregard of standards of behavior which the employer can rightfully expect from the employee, or (4) negligence which manifests culpability, wrongful intent, evil design, or

intentional and substantial disregard of the employer's interests or of the employee's duties and obligations.' . . ." *Smith v. Sorensen*, 222 Neb. 599, 603, 386 N.W.2d 5, 8 (1986); *McCorison v. City of Lincoln*, 215 Neb. 474, 339 N.W.2d 294 (1983); *Stuart v. Omaha Porkers*, 213 Neb. 838, 331 N.W.2d 544 (1983). While absenteeism can constitute "misconduct" under the statutes if the absences are without notice or unexcused or are continued despite warnings from the employer, *McCorison v. City of Lincoln, supra,* it is not considered misconduct to follow the advice of a treating physician and remain absent from work. See *Pacific Northwest Bell Tel. v. Employment Div.*, 37 Or. App. 843, 588 P.2d 654 (1978).

Unless it can be said that in some manner Ms. Tuma deliberately violated some rule, I am unable to find any evidence to support a finding that her termination was due to misconduct.

O.P.P.D. concedes that Ms. Tuma was being treated by a physician and had been ordered not to return to work for 4 weeks. Ms. Tuma's supervisor, Ms. Finnell, testified that she was fully aware of the nature of Ms. Tuma's illness and the reason why she did not return to work. Ms. Finnell testified as follows:

Q. So, is it fair to say that, regardless of whether there was a doctor's statement or not, you as her supervisor at the Omaha Public Power District were fully aware of the nature of her illness and the reason why she did not return to work; is that correct?

A. Yes.

Q. And you had relayed that information on to your superiors at OPPD; is that correct?

A. Yes.

Q. So there could be no question that your business knew exactly why she was not there?

A. Yes.

And while Ms. Tuma did not send a medical statement to O.P.P.D., she did in fact write to it. Ms. Finnell testified in that regard as follows:

Q. All right. So, at least, as far as that conversation on

the 17th goes, there is no question that she did tell you she was going to send a letter; and she did, in fact, send the letter, didn't she?

A. Yes.

Q. You received the letter; is that correct?

A. I received that letter on the 22nd.

Q. The letter purports to be from Rita Tuma, does it not?

A. Yes.

Q. And the letter contains the information which she told you on the telephone, whether it be reading verbatim or told you, either way it contained that very information, didn't it?

A. Yes.

Q. You were aware when you received the letter, at least through her anyway, that she had seen the doctor and that she did have damage to her nasal tissue, and that he had advised her that there were unhealed, bleeding points because there had been no steps to remedy the pollution in the air, and that she should not return to work for four weeks?

You were at least — true or not, you were at least aware of that information from the letter; is that correct?

A. Yes.

Furthermore, while the majority makes a great deal out of the fact that Ms. Tuma failed to provide a letter from her physician, the evidence is clear that the company did not ask at any time for such a letter, nor did it have any rule requiring such a letter. Ms. Finnell testified as follows:

Q. Now, would I be correct in assuming that as a supervisor for her or any employee, part of your job would be to provide them instruction when they need a particular document or when they need something; is that correct?

A. Yes.

Q. Isn't it true, Miss Finnell, that you had never, at any time, told Ms. Tuma that "You need a statement from and signed by a physician in order to be excused from work"; isn't that true?

A. That's true.

Q. As a matter of fact, based upon your testimony at the prior hearing, one of your answers was: "Ms. Tuma called me to tell me that she had seen her doctor and that he had suggested that she take another four weeks off because of her condition. I questioned the four weeks, and she explained her medical problem to me over the phone, and then she volunteered to give me a letter."

A. Yes.

Q. That's your testimony; is that correct?

A. Yes.

Q. And you did receive a letter from her?

A. Yes.

Q. You as her supervisor never, at any time, told her or asked her to send a doctor's statement; isn't that correct?

A. That's correct. I assumed —

Q. You assumed?

A. Yes.

. . . .

Q. You assumed; is that correct?

A. She had provided me with one earlier. When she mentioned getting a letter to that effect, I assumed that it would be just like the one I had already received.

Q. But as her supervisor you never told her, "Look, Rita, in order for you to be gone for a time like four weeks, we're going to have to have some kind of medical substantiation"; you never told her that, did you?

A. No.

Q. And, to your knowledge, neither did anybody else from OPPD?

A. No.

This is supported by the testimony of Ms. Tuma, who testified on direct examination as follows:

Q. Now, with that what did you do with that information?

A. I contacted my attorney, and then I contacted Joyce Finnell. I read her a letter that I had composed and typed myself and told her that I would be sending her a copy of that letter in the mail.

I told her if she needed additional information she should contact my attorney *or the doctor*.

Q. Now, was this on the 17th of December?

A. Yes.

Q. Did you tell Miss Finnell — what did you tell her exactly?

A. The letter, which is in the Bill of Exceptions, I just read that to her.

Q. This Joyce Finnell is the same person you referred to earlier; is that correct?

A. Yes.

Q. And you had talked to her extensively concerning the problems you had been having; is that right?

A. Yes.

Q. Did you tell her on that day what Dr. Duff had advised you to do?

A. Yes.

Q. What, if anything, did Miss Finnell ask you to do at that time?

A. Nothing.

(Emphasis supplied.)

While there may be some dispute about the conversation between Ms. Tuma and her supervisor, there is no dispute that Ms. Tuma was not aware that a physician's statement was required or that if she did not provide such a statement she would be discharged. While the majority contends that Ms. Tuma's behavior was detrimental to her employer's interest and constituted misconduct, the evidence shows without dispute that Ms. Tuma was following her doctor's orders. The majority points out that Dr. Duff did not specifically recall the conversation, yet nowhere did Dr. Duff deny that he was treating Ms. Tuma or that he had instructed her that she must remain in a smoke-free environment. Had O.P.P.D. wanted something more than Ms. Tuma's letter, it should have made that request. To have expected Ms. Tuma to know that she was to send a letter from a physician and that upon failure to do so she would be considered to have terminated her employment was not reasonable under the facts.

The majority attempts to create the impression that Dr. Duff

did not recall treating Ms. Tuma; nevertheless, he testified by deposition with regard to these matters. His testimony is as follows: "When she came back and she still hadn't totally healed up I said, 'It seems to me if you continue to be exposed to whatever you are being exposed to, it might be detrimental and you might consider altering your environment.' " He further testified in his deposition that the trial and error suggested by O.P.P.D.'s physician could only be done after Ms. Tuma's nose was normal again. It had not yet reached that point.

This is not a case in which the employer was uncertain as to the extent and the nature of the injury. O.P.P.D.'s own physician sent a letter to O.P.P.D. supporting Dr. Duff's diagnosis of Ms. Tuma's condition. The letter, as noted by the majority, said:

As long as she [Tuma] has symptoms from the exposure to cigarette smoke, she will probably not be able to work in surroundings in which there is a significant amount of exposure. The amount of exposure that she would tolerate could only be determined by trial and error. Certainly there is a pre-existing history of allergy and hypersensitivity which may be a predisposing factor in her current difficulties. It is my feeling that she could return to work immediately if she were in a smoke-free environment.

Yet, as noted by the majority, it is conceded by everyone that she was not going to be in a smoke-free environment. Nevertheless, the majority suggests that because she was not willing to continue bleeding, she was guilty of willful misconduct.

Furthermore, the facts do not support the position taken by the majority. The testimony is uncontroverted that by moving the desks the situation was not improved, but rather became worse. That was the reason O.P.P.D. considered the additional duct. The evidence is further clear that the additional duct was no real solution. Finally, the evidence is clear that she was never told that the change had been made. Ms. Finnell was asked:

Q- Did you ever advise Mrs. Tuma that there was a — a change in the - - -
A- The air-flow?
Q- - - -air — air-flow system?

A-   Between the time when it was installed and the time she left. She was only in the office for three hours and I didn't have a chance to do that.

Ms. Tuma was never made aware that any changes were made, and no one bothered to explain to her what the changes were or how they might improve the situation. Furthermore, the record is devoid of any evidence to indicate that the changes would have made any difference. All that Ms. Tuma knew is that if she returned to work, she would continue to suffer from bleeding.

Lastly, action taken by O.P.P.D. did not comply with the requirements of the Nebraska Clean Indoor Air Act, as suggested in the letter from O.P.P.D. to Ms. Tuma or as suggested by the majority. Neb. Rev. Stat. § 71-5702 (Reissue 1986) specifically provides: "The purpose of sections 71-5701 to 71-5713 is to protect the public health, comfort, and environment by *prohibiting smoking* in public places and at public meetings except in designated smoking areas." (Emphasis supplied.) Under the provisions of Neb. Rev. Stat. § 71-5704 (Reissue 1986), this work area was clearly a public place within the meaning of the act. It was not appropriate for O.P.P.D. to designate the nonsmoking area; rather, it was necessary for O.P.P.D. to designate a limited smoking area. Even then, "Where smoking areas are designated, existing physical barriers and ventilation systems shall be used to minimize the toxic effect of smoke in adjacent nonsmoking areas." Neb. Rev. Stat. § 71-5708 (Reissue 1986). Finally, Neb. Rev. Stat. § 71-5709 (Reissue 1986) provides:

The proprietor or other person in charge of a public place shall make reasonable efforts to *prevent smoking* in the public place by:

(1) Posting appropriate signs;

(2) Arranging seating to provide a smoke-free area;

(3) Asking smokers to refrain from smoking upon request of a client or employee suffering discomfort from the smoke; or

(4) Any other means which may be appropriate.

(Emphasis supplied.)

The evidence is clear that no arrangements were made to

provide a smoke-free area, nor were employees asked to refrain from smoking.

While O.P.P.D. may have been justified in discharging Ms. Tuma because of its inability to provide her with a safe place to work, its inability to do so did not justify its discharging her and claiming that the discharge was for misconduct on her part so as to deprive her of unemployment compensation benefits.

While Ms. Tuma obviously cannot obtain much comfort from our decision in this case, perhaps she can find solace in the haunting song from Jerome Kern:

They asked me how I knew
My true love was true?
I of course replied,
"Something here inside,
Cannot be denied."
. . . Smoke gets in your eyes.