June 19, 2017

**Supreme Court**

No. 2014-187-Appeal.
(A.A. 13-133)
(dissent begins on page 14)

Michael J. Beagan : 

v. :

Rhode Island Department of Labor and :
Training, Board of Review et al. :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-187-Appeal.
(A.A. 13-133)

                                              :

                Michael J. Beagan

                        v.                    :

     Rhode Island Department of Labor and     :
        Training, Board of Review et al.       :


            Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

                                 **O P I N I O N**

        **Chief Justice Suttell, for the Court.**  The claimant, Michael J. Beagan, filed a petition

for writ of certiorari to this Court pursuant to the Administrative Procedures Act, G.L. 1956 §

42-35-16, seeking review of a decision of the District Court affirming the denial of

unemployment benefits to him.  Following his termination from employment with the defendant,

Albert Kemperle, Inc.[1] (Kemperle, Inc. or employer), the Rhode Island Department of Labor and

Training (DLT) denied Beagan's application for unemployment benefits on the basis that he had

been discharged for "disqualifying reasons" pursuant to G.L. 1956 § 28-44-18 of the Rhode

Island Employment Security Act[2] and was therefore not entitled to such benefits.  After

exhausting his administrative remedies, Beagan sought review in District Court, where DLT's

decision was affirmed.  We issued a writ of certiorari; and, for the reasons stated herein, we

quash the judgment of the District Court.

---

[1] Kemperle, Inc. is a distributor of auto paint, body, and equipment.
[2] General Laws 1956 § 28-44-18(a) provides, in relevant part, that "an individual who has been discharged for proved misconduct connected with his or her work shall become ineligible for * * * benefits * * *."

- 1 -

# I

## Facts and Procedural History[3]

Beagan was employed by Kemperle, Inc. as a full-time delivery driver for approximately four years before he was discharged on March 7, 2013. Shortly before his termination, Kemperle, Inc. had issued a new "accident policy" that Beagan had initially refused to sign. According to Beagan's manager, Henry Morancey, Beagan raised concerns over this new policy with other employees and began to cause a "ruckus." On March 6, 2013, Morancey clarified this new policy to Beagan in a conversation, after which Beagan agreed to sign the policy. During that conversation, Beagan also voiced concerns that he was not being paid 2.5 hours for overtime work each week.[4] Following their exchange, Morancey wrote an email to the owner of Kemperle, Inc., Ronald Kemper, stating:

> "I just wanted to keep you informed of a situation here in the Rhode Island location. When the new 'Standard Operations & Procedures' came out, I printed copies for each of my employees and asked them to read them over, sign and return to me. Over the next week or so, * * * Beagan, one of my drivers, began to complain about the policies and how unfair he thought they were, how his wife works for a Workers' Compensation attorney and she thinks [Beagan] should be compensated for at least 2-1/2 hours of overtime every week and he shouldn't have to comply with the standard operation procedures, etc. He has been voicing his opinions to not only the drivers here in Rhode Island, but also the drivers in the Hartford location creating a lot of ill-will.
>
> "Yesterday I told everyone that the signed copies were due and needed to be returned to me as I had to return them to Corporate. [Beagan] initially refused to sign the document. He reiterated his feelings that the terms were unfair and he did not want to sign it. I

---

[3] These facts were obtained from the hearing transcripts and, notably, the material facts pertinent to this appeal do not appear to be in dispute.

[4] He explained that his regular schedule was from 8 a.m. to 5 p.m., Monday through Friday. This meant a 45-hour work week, minus a thirty minute daily lunch break that was non-paid, totaling 42.5 hours. Morancey denied this allegation and stated that Beagan had a one-hour lunch break that Beagan took daily.

told him it was his choice to sign or not, however, there would most likely be consequences if he did not comply. I went on to tell him that everyone in the company was required to sign the document, myself included. He began ranting about how his wife works for a Workers' Compensation attorney and he didn't have to sign."

The following day, Morancey called Beagan into his office, intending to terminate his employment because, according to Morancey, the previous day the two "had some * * * words and [Beagan] [had taken] a couple of personal shots at [him]." He indicated that, although "normally" an employee was given three written warnings before being terminated, because "things were getting * * * pretty bad between" the two, "[he] felt it was in everyone's best interest to let [Beagan] go." Morancey testified that, while he was speaking to Beagan, Beagan "got teary-eyed and stuff" and that Morancey "kind of took a little bit of pity on him" and decided to give him another chance. Instead of terminating Beagan's employment, Morancey gave him a written notice;[5] Beagan apologized, signed a copy of the email Morancey had sent to Kemper as well as the written notice, and acknowledged that he had exhibited insubordinate behavior. Beagan was informed that the next violation would result in termination. Morancey then explained what occurred next:

> "I then proceeded to send [Beagan] on his daily routine to * * * make deliveries to customers. * * * [I]n * * * the office he made a comment about how * * * he can write whatever he wants on Facebook, which, I guess, is * * * his right under the Constitution of free speech. * * * I guess, he said a lot of stuff about me personally, on his Facebook account, none of which I ever followed. I do not use Facebook. * * * [H]e basically told me in the office, before we adjourned the meeting, that * * * I couldn't see what he writes on his Facebook because he has me blocked. So, that being said, * * * it had piqued my curiosity to see exactly what [he] was saying about me. So I had a third party, who I'd

---

[5] The written notice, dated March 7, 2013, provided: "Exhibits insuborinate [sic] behavior, lacks respect for company policiy [sic], been on going [sic] problem. Had sit down, agreed to give chace [sic] to improve[;] next violation will result in termination."

like to remain anonymous, log on to Facebook and bring up [Beagan's] page, at which point I * * * saw quite a few things that he had to say about me and about our meeting in the office that * * * morning of [March 7]."

He later described that Beagan had spoken in a "smug manner" when he indicated that Morancey would not be able to find out what he says on Facebook. A post made on Beagan's Facebook page that day read: "It's a good thing my boss doesn't take things personal and wanna [sic], like, know if I wrote shit about him. I sometimes forget that despite that [sic] fact he walks and talk [sic] like a real person, he isn't a real boy, Geppeto [sic]."[6] This post appears to have been made three hours prior to Morancey accessing Facebook.[7] When Beagan returned from his morning deliveries, Morancey informed him that his employment was being terminated. Beagan recalled Morancey mentioning Facebook at that time, but he left the premises without any further discussion.[8]

## A

## Administrative Procedures

On March 18, 2013, Beagan filed a claim for unemployment benefits with DLT. The DLT form completed by Kemperle, Inc. noted the reason for Beagan's discharge as: "misconduct * * * [Beagan] was written up then left the office exhibiting insubordination in front of other employee [sic] right after signing a written notice. He was then terminated[.] Prior to be [sic] written up he was voicing his negative attatude [sic] in other business loccotons [sic]." Additionally, Kemperle, Inc.'s "employer statement," again describing the cause of Beagan's

---

[6] Beagan was apparently referencing Mister Geppetto from the well-known novel, The Adventures of Pinocchio, by Carlo Collodi.

[7] Although there was no time stamp on the Facebook post, Morancey testified that he "printed it out that morning, three hours after [their] meeting." The Facebook post indicated it was made "3 hours ago"—i.e., three hours prior to the time Morancey printed the page.

[8] Several other posts were read into evidence; however, given that they were all made prior to the "final warning" on March 7 and did not enter as exhibits, we deem them to be irrelevant.

termination, quoted the language of the written warning, described that Beagan was angry about the new policy and that, after signing the written policy, "[Beagan] went out of the office ranting and raging to other employees about management and the new policy. He wanted overtime. He was given [two] 15 minute breaks and ½ hour lunch[es]. [H]e was saying he wanted overtime and causing a commotion with other employees." Neither of these forms referenced any Facebook post as the cause of discharge.

On April 22, 2013, the director of DLT denied Beagan's application because it found that Beagan had been discharged due to "unprofessional behavior in the workplace" and was disqualified from receiving benefits because his "actions were not in [the] employer's best interest[]" pursuant to § 28-44-18.

Beagan timely appealed this determination to the appeal tribunal (referee) pursuant to § 28-44-43.[9] On May 29, 2013, a hearing was held before the referee. At the hearing, both Beagan and Morancey testified. In addition to recounting the incidents of March 6 and 7 (as summarized herein), Morancey testified that "the Facebook posting was the reason [Beagan] was let go, ultimately." He also noted that the reason he terminated Beagan's employment, "aside from the fact that [Beagan] wrote what he did on Facebook, [was] that [there was] also a policy that [Beagan] [was] not supposed to use his cell phone for texting or Internet use while he[] [was] driving a company vehicle. And given the timeframe that he posted that threat, it[] [was] obvious that he was on the road."

At the close of the hearing, the referee issued a written decision affirming the director's denial of benefits. In his decision, the referee made the following findings of fact:

---

[9] Section 28-44-43 provides that a claimant may appeal the determination of the director to the referee.

"[Beagan] worked as a driver for Albert Kemperie [sic], Inc. for 4 years and 3 months, last on March 7, 2013. The employer terminated [Beagan] for violating the company policy concerning insubordination. [Beagan] was upset about new company policy changes concerning abuse of time off and driving accidents in company vehicles. [Beagan] was inciting coworkers in his office and also in the Connecticut office against the policy changes creating a lot of ill-will. The employer introduced evidence that showed that the claimant was posting derogatory comments about his supervisor on Facebook that named his supervisor. [Beagan] stated that he was terminated because he complained about not being paid 2.5 hours of overtime per week."

The referee concluded that:

"[Beagan] was terminated for violating the company policy concerning insubordination, therefore, I find that sufficient credible testimony has been provided by the employer to support that the claimant's actions were not in the employer's best interest. Therefore, I find that [Beagan] was discharged for disqualifying reasons under Section 28-44-18 * * *."

Beagan appealed the referee's decision to the full board of review (the board) pursuant to § 28-44-47. On August 2, 2013, the board affirmed the referee's decision, finding that there was a proper adjudication of the facts and a proper application of the law. The board declared the decision of the referee "to be the decision of the [b]oard * * * and incorporated by reference [t]herein."[10]

---

[10] A member of the three-person board dissented from the decision, opining that "[t]he actions of [Beagan], a four year employee, [did] not seem to rise to the level of [Turner v. Department of Employment Security, Board of Review, 479 A.2d 740 (R.I. 1984)] nor [did] they violate a clear, reasonable rule. All employees at some point express dissatisfaction with their job situation but it is not misconduct as envisioned in denying benefits." See note 15, infra.

**B**

**District Court Decision**

Undeterred, Beagan appealed the board's decision to the District Court pursuant to § 28-44-52.[11] The District Court entered judgment on June 4, 2014, affirming the board's finding of ineligibility based on disqualifying misconduct.[12] Noting some errors or "part truths" in the decision of the referee, the District Court articulated that it had needed to "reconstruct the decision and the record in order to determine if it was clearly erroneous or contrary to law * * *."[13]

---

[11] Section 28-44-52 provides, in pertinent part, that the decision of the board "shall be final unless any party in interest, including the director, initiates judicial review by filing a petition with the clerk of the * * * [D]istrict [C]ourt * * *."

[12] Beagan's claim was first heard by a magistrate of the District Court pursuant to G.L. 1956 § 8-8-8.1(c)(7); the magistrate filed "Findings and Recommendations," recommending that the decision of DLT's board be affirmed. A District Court judge, thereafter, conducted a <u>de novo</u> review of the record and memoranda of counsel, and adopted the "Findings [and] Recommendations" as her own and issued an order affirming the decision of the board.

[13] We note that several findings made by the referee, and later adopted by the board, are clearly erroneous and not supported by the evidence presented at the hearing. First, the referee found that Beagan violated a "company policy" concerning "insubordination," but no such policy was introduced into the record, nor did the employer identify any. Furthermore, the referee found that Beagan "named his supervisor" in his Facebook posts; however, a review of all of the Facebook posts read into the record by Morancey reveals no instance where Morancey or Kemperle, Inc. are identified by name.

While it does not affect our ultimate conclusion in this case, we also pause to note that the District Court, in admirably endeavoring to "reconstruct" the decision of the referee due to the factual errors contained in that decision, overstepped its role. The Administrative Procedures Act provides that the reviewing court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." G.L. 1956 § 42-35-15(g). Moreover, § 28-44-54, the statute specifically dealing with the "[s]cope of judicial review" of a decision of the DLT board, states as follows: "The jurisdiction of the reviewing court shall be confined to questions of law, and, in the absence of fraud, the findings of fact by the board * * *, if supported by substantial evidence regardless of statutory or common law rules, shall be conclusive." <u>See</u> <u>Baker v. Department of Employment and Training Board of Review</u>, 637 A.2d 360, 362 n.3 (R.I. 1994) (stating that "the standard of review defined in § 42-35-15(g) is consistent with the standard enunciated in the antedated § 28-44-54"). Rather than "reconstruct[ing]" the referee's decision in order to alter the numerous factual errors which pervade that decision, the District Court should have remanded the case back to the referee to make accurate factual findings based

The District Court opined that the posting of the offensive Facebook entry constituted misconduct or insubordination and was connected to Beagan's work (albeit "barely so"). In addition, the District Court indicated that the allegations were proven because Beagan did not deny making the Facebook post. Because no company policy had been submitted, the District Court looked to several dictionary definitions of insubordination that defined it as an "unwilling[ness] to submit to authority," or "a willful disregard of an employer's instructions." While acknowledging that there was no allegation that Beagan was insubordinate in "the usual sense," the District Court concluded that "[t]he administrative fact-finders could well conclude that the posting of such materials was utterly corrosive of the supervisor-employee relationship * * * and that his continued employment by Kemperle[,] [Inc.] was impossible." The District Court was reluctant to conclude that Beagan's Facebook post was connected to his work, specifically noting that to so find "would be inviting management to monitor their employees' social media accounts, which [the District Court] believe[d] would be a mistake." However, the District Court ultimately determined that the facts established (1) that Beagan "baited" Morancey into searching his Facebook page and (2) despite this being a "slender reed upon which to base a finding that the postings were 'connected' to his work," the connection was sufficiently established.

The District Court concluded "that the decision of the [b]oard * * * [was] supported by reliable, probative, and substantial evidence of record and [was] not clearly erroneous * * *."[14]

---

on the record or have reversed the decision of the board if it concluded that the decision was not supported by substantial evidence. It was beyond the District Court's prescribed role to make its own factual findings.

[14] The District Court, "in order to avoid an unnecessary remand," also considered the second reason presented by Morancey at the hearing as the basis of Beagan's termination—that Beagan made the Facebook post while operating a company vehicle in violation of company policy. The District Court ruled that, while posting-while-driving would constitute misconduct and such post

- 8 -

Thereafter, Beagan filed a petition for a writ of certiorari to this Court, which we granted on March 30, 2015.

## II

## Standard of Review

In reviewing cases brought under the Administrative Procedures Act, G.L. 1956 chapter 35 of title 42 (the act), this Court is limited to reviewing questions of law. Foster-Glocester Regional School Committee v. Board of Review, 854 A.2d 1008, 1012 (R.I. 2004) (Foster-Glocester). "This Court does not substitute its judgment for that of the agency concerning the credibility of witnesses or the weight of the evidence concerning questions of fact." Tierney v. Department of Human Services, 793 A.2d 210, 213 (R.I. 2002).

Pursuant to § 42-35-15(g) of the act, this Court may:

> "affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> > "(1) In violation of constitutional or statutory provisions;
> > "(2) In excess of the statutory authority of the agency;
> > "(3) Made upon unlawful procedure;
> > "(4) Affected by other error or law;
> > "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> > "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

See Foster-Glocester, 854 A.2d at 1012-13; see also Arnold v. Rhode Island Department of Labor and Training Board of Review, 822 A.2d 164, 167 (R.I. 2003); Rhode Island Temps, Inc. v. Department of Labor and Training, Board of Review, 749 A.2d 1121, 1124 (R.I. 2000).

---

would be connected to the workplace, the employer did not meet its burden of proving that such conduct occurred. In light of the fact that this second proffered reason for firing Beagan was not considered by the director, referee, or full board, and that the employer wholly failed to present any evidence that Beagan made the posting while operating the vehicle, we decline to address this issue and we affirm the District Court in this regard.

On certiorari, this Court will not weigh the evidence; "we limit the scope of our review to the record as a whole to determine whether any legally competent evidence exists therein to support the trial court's decision or whether the trial court committed error of law in reaching its decision." Rhode Island Temps, Inc., 749 A.2d at 1124. Legally competent evidence is defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Id. at 1125 (quoting Center for Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 684 (R.I. 1998)).

## III

## Analysis

Beagan argues that the District Court improperly engaged in supplemental fact finding to justify the decision of the board. Moreover, Beagan contends that the District Court erred in finding a sufficient connection between his Facebook post and the workplace and in finding that the Facebook post constituted insubordination amounting to misconduct. Lastly, Beagan argues that his Facebook post was protected under state and federal law and implicated his rights to free expression and privacy; he adds that to hold otherwise would have a chilling effect on concerted activity among employees.

The narrow issue before us on certiorari is whether there is legally competent evidence in the record to support the District Court's decision affirming the board finding that Beagan was discharged for disqualifying reasons. Section 28-44-18(a) provides, in relevant part, that:

> "an individual who has been discharged for proved misconduct connected with his or her work shall become ineligible for waiting period credit or benefits for the week in which that discharge occurred * * *. For the purposes of this section, 'misconduct' is defined as deliberate conduct in willful disregard of the employer's interest, or a knowing violation of a reasonable and uniformly enforced rule or policy of the employer, provided that such

- 10 -

violation is not shown to be as a result of the employee's incompetence. Notwithstanding any other provisions of chapters 42 – 44 of this title, this section shall be construed in a manner that is fair and reasonable to both the employer and the employed worker."

Accordingly, pursuant to the language set forth in § 28-44-18(a), in order to determine whether an employee is ineligible for benefits based on a disqualifying reason, one must consider: (1) whether there was an act of proven misconduct;[15] and (2) whether the misconduct was connected to the employee's work.

As our decision to quash the judgment of the District Court rests upon our conviction that the record does not contain legally competent evidence to support a finding that Beagan's conduct was connected to his work, we need not delve into the misconduct prong of the § 28-44-18 analysis. Instead, we begin our discussion with the connection prong, as it is dispositive of this case. As such, for the purposes of this opinion, we shall assume, without deciding, that

---

[15] In addition to the statutory definition of misconduct found within § 28-44-18(a), in <u>Bunch v. Board of Review, Rhode Island Department of Employment and Training</u>, 690 A.2d 335 (R.I. 1997), this Court adopted the following definition:

> "[M]isconduct * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his [or her] employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute." <u>Id.</u> at 337 (emphasis omitted) (quoting <u>Turner v. Department of Employment Security, Board of Review</u>, 479 A.2d 740, 741-42 (R.I. 1984)).

Beagan's actions of posting the message to Facebook constituted misconduct within the meaning of the statute.

**A**

**Connection Between Conduct and Workplace**

As noted, pursuant to § 28-44-18(a), only misconduct that is "connected with [an employee's] work" may be categorized as "disqualifying misconduct." Our case law on the "connection" prong is not extensive. In Bunch v. Board of Review, Rhode Island Department of Employment and Training, 690 A.2d 335 (R.I. 1997), this Court concluded that the fact that the police found drugs in an employee's home was disqualifying misconduct sufficiently connected to the employment, even though the conduct occurred outside of the claimant's workplace, because the employer had the right to expect the employee to comply with criminal laws during and outside of her work. Id. at 337-38. We highlighted that this was especially true where the employee's position as superintendent of the Rhode Island Training School for Youth was a position of "high visibility and great responsibility" and where "[m]any of the young people committed to her care at the training school were confined for drug-related offenses." Id. at 335, 337-338. This Court, however, has yet to consider the connection between an employee's alleged misconduct and the workplace as it relates to social media and online activity.

In asserting that the Facebook post was not connected to his employment, Beagan argues that he never named the "boss" he was referring to in his post and he also did not identify Kemperle, Inc. by name. Beagan also highlights that his post was not accessible by Morancey because Began had blocked Morancey from his Facebook page and that his Facebook profile "was not accessible by other workers of [Kemperle, Inc.]." Beagan contends that the District Court erred in finding a connection between the Facebook post and the workplace, insofar as said

post was neither made in the workplace nor permissibly accessible to the employer, his supervisor, employees, or customers of the employer.

While hesitant to find "the needed 'connection' with the workplace," the District Court ultimately concluded that Beagan "baited * * * Morancey into searching out his Facebook page[,]" thus providing the requisite connection. We disagree. It is our opinion that Beagan's alleged misconduct lacks the connection to the workplace contemplated by § 28-44-18. It is uncontested that Morancey was "blocked" from Beagan's Facebook page, and there is no evidence that the post was directly accessible by any other employee, associate, or customer of Kemperle, Inc. Further, there is no allegation that Beagan authored the post on any electronic device belonging to his employer, nor does the content of the post relate to Beagan's job performance. Moreover, the employer does not have a social media policy that was introduced into evidence. See Kirby v. Washington State Department of Employment Security, 342 P.3d 1151, 1152-53 (Wash. Ct. App. 2014). Beagan also specifically denied making the Facebook post while he was on the road; and the employer, which bears the burden of proof when seeking to have an employee disqualified from unemployment benefits, Foster-Glocester, 854 A.2d at 1018, presented no contrary evidence. Given all of these facts, we are of the opinion that Beagan's statement to Morancey that he did not have access to Beagan's Facebook page alone does not support a finding that the Facebook post was connected with Beagan's work. Even if we were to accept the finding of the District Court that Beagan "baited" Morancey to access the Facebook post—a finding that was not made by the board—the mere fact that Beagan goaded Morancey into enlisting an anonymous third party to access the Facebook page would not, in the circumstances of this case, create a nexus with the workplace.

Significantly, the question before this Court is not whether Beagan was properly terminated from his employment. Instead, our task is to examine the record to determine if any legally competent evidence exists therein to support a finding that Beagan was ineligible for unemployment benefits. See § 28-44-18. As we undertake this review, we do so in "light of the expressed legislative policy that '[the Employment Security Act] * * * shall be construed liberally in aid of [its] declared purpose which declared purpose is to lighten the burden which now falls on the unemployed worker and his [or her] family.'" Harraka v. Board of Review of Department of Employment Security, 98 R.I. 197, 200, 200 A.2d 595, 597 (1964) (quoting G.L. 1956 § 28-42-73). Accordingly, we decline "to enlarge the exclusionary effect of expressed restrictions on eligibility under the guise of construing such provisions of the act." Id. We conclude, therefore, that legally competent evidence that Beagan's Facebook post was connected to his work in the manner contemplated by § 28-44-18 is not present in the record before us.[16]

## IV

### Conclusion

For the reasons stated herein, the decision of the District Court is quashed, and the papers in the case are remanded to the District Court with directions to enter judgment reversing the board and ordering that Beagan be awarded unemployment benefits.

**Justice Goldberg, dissenting.** I respectfully dissent from the decision of the majority. The single issue in this case is whether any legally competent evidence exists in the record to support the findings made by the referee, adopted by the board of review (the board), and

---

[16] Because we reverse the decision of the District Court on the basis that there was no legally competent evidence to support a finding that the alleged misconduct was connected with Beagan's work, we decline to address the remainder of Beagan's arguments.

subsequently affirmed by the District Court. Although the majority correctly identifies the issue, the majority then proceeds to re-evaluate and weigh the evidence presented and concludes that "the record does not contain legally competent evidence to support a finding that [the claimant's] conduct was connected to his work * * *." (Emphasis added.) It is my opinion that this conclusion impermissibly exceeds the scope of this Court's review and is not the Court's function on certiorari.

The board adopted the findings made by the referee, and which findings determined that this claimant was prohibited from collecting unemployment benefits because he was terminated for proved misconduct connected with his work. See G.L. 1956 § 28-44-18(a) (providing that "an individual who has been discharged for proved misconduct connected with his or her work" is ineligible to receive unemployment compensation). The District Court, on de novo review, affirmed this holding after a careful and detailed consideration of the evidence. This Court's review on certiorari, therefore, "is limited to 'an examination of the certified record to determine if there is any legally competent evidence therein to support the [board's] decision.'" Johnston Ambulatory Surgical Associates, Ltd. v. Nolan, 755 A.2d 799, 804-05 (R.I. 2000) (quoting Barrington School Committee v. Rhode Island State Labor Relations Board, 608 A.2d 1126, 1138 (R.I. 1992) (emphasis added)). "On certiorari, this Court will not weigh the evidence." Elias-Clavet v. Board of Review, 15 A.3d 1008, 1013 (R.I. 2011) (quoting Foster-Glocester Regional School Committee v. Board of Review, 854 A.2d 1008, 1012 (R.I. 2004)). Rather, "we give deference to the factual findings of the administrative agency." Reilly Electrical Contractors, Inc. v. State Department of Labor and Training ex rel. Orefice, 46 A.3d 840, 844 (R.I. 2012) (quoting Auto Body Association of Rhode Island v. State Department of Business Regulation, 996 A.2d 91, 95 (R.I. 2010)); see also Foster-Glocester Regional School Committee,

854 A.2d at 1012 ("This Court does not substitute its judgment for that of the agency concerning the credibility of witnesses or the weight of the evidence concerning questions of fact." (quoting Tierney v. Department of Human Resources, 793 A.2d 210, 213 (R.I. 2002))).

This Court "must uphold the [board's] conclusions when they are supported by <u>any</u> legally competent evidence in the record." Rocha v. State Public Utilities Commission, 694 A.2d 722, 725 (R.I. 1997) (emphasis added). This Court must uphold the board's decision "even in a case in which the [C]ourt 'might be inclined to view the evidence differently and draw inferences different from those of the [board].'" Nolan, 755 A.2d at 805 (quoting Rhode Island Public Telecommunications Authority v. Rhode Island State Labor Relations Board, 650 A.2d 479, 485 (R.I. 1994)).

In this case, the majority was inclined to "view the evidence differently" and indeed "dr[ew] inferences different from those of the agency." See Nolan, 755 A.2d at 805. Specifically, the majority drew an inference that claimant's conduct was not workplace related because "Morancey was 'blocked' from [claimant's] Facebook page," the Facebook post was not "authored * * * on any electronic device belonging to his employer," and "the content of the post[ing] [did not] relate to [claimant's] job performance." However, these inferences overlook the evidence in the record supporting the board's findings.

Indeed, the record indicates that claimant was scheduled to be terminated that morning for refusing to sign the company policy, and according to Morancey, claimant had been "creating a lot of ill-will." This is the conduct that led to the final warning which the record discloses was short-lived. Within hours of the final warning, claimant proceeded to "post[] derogatory comments about his supervisor on Facebook[.]" The claimant's conduct was found to be "not in

- 16 -

the employer's best interest." The District Court reviewed this same evidence and agreed with the board, further concluding that claimant "baited [his supervisor] into searching out his Facebook page" such that his supervisor "had to look, and after looking, he saw [the Facebook posts], and having seen, he had * * * no choice but to terminate [claimant]." The District Court was satisfied that "on the particular facts of the instant case," that "these comments [were brought] into the workplace"—by claimant—thus providing the "needed 'connection' with the workplace." In light of this uncontradicted and competent evidence, it is my opinion that the majority has exceeded the boundary of certiorari review and erred in failing to defer to the findings made by the board and affirmed by the District Court.

Furthermore, I agree with the majority that this Court has yet to consider the use of social media in the employment context, or freedom of speech and employment policies for internet postings; those issues are not before the Court in this case. This case is nothing more than a disgruntled, recalcitrant employee, who tearfully begged his employer for another chance to keep his job and then smugly baited him into viewing his Facebook posts. He was fired later that same day for conduct that arose within hours of the final warning—a Facebook post that referred to his supervisor as someone who is not a real person.[1] If he was not terminated for misconduct connected to his work, then why was he fired? Consequently, I dissent.

---

[1] I do note, however, that Beagan may learn a hard lesson based on the law of unintended consequences; because anyone, including potential employers with internet access, can read this opinion on the World Wide Web.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Michael J. Beagan v. Rhode Island Department of Labor and Training, Board of Review et al. |
| **Case Number** | No. 2014-187-Appeal. (A.A. 13-33) |
| **Date Opinion Filed** | June 19, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Sixth Division District Court |
| **Judicial Officer From Lower Court** | Chief Judge Jeanne E. LaFazia Magistrate Joseph P. Ippolito, Jr. |
| **Attorney(s) on Appeal** | For Claimant: Richard A. Sinapi, Esq. |
| | For Defendant: Valentino D. Lombardi, Esq. Donald G. Elbert, Jr. |