BELL FEDERAL CREDIT UNION, APPELLANT, V. KATHLEEN CHRISTIANSON ET AL., APPELLEES.

466 N.W.2d 546

Filed March 8, 1991.  No. 90-291.

Soren S. Jensen and J Russell Derr, of Erickson & Sederstrom, P.C., for appellant.

Laureen Van Norman and John F. Sheaff for appellee Commissioner of Labor.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Bell Federal Credit Union (Bell) appeals a district court holding that Bell's striking employees were eligible for unemployment benefits because Bell did not suffer a "stoppage of work" as that phrase is used in the Employment Security Law.

We reverse the holding and remand this cause for further proceedings because the district court for Douglas County used the wrong standard of review and because this court has concluded that as a matter of law, it cannot be said that a work stoppage did or did not occur.

Bell's three assignments of error in substance allege that the district court erred in (1) applying the wrong standard in reviewing the Nebraska Appeal Tribunal's decision, (2) entering an order applying the proper standard of review after an appeal

had already been docketed with this court, and (3) finding that there was competent and substantial evidence to support the appeal tribunal's decision to award unemployment benefits to Bell's striking employees.

Bell is a federally chartered credit union serving 32,000 members. Membership is restricted to individuals who are employed by companies within Bell's field of membership and to relatives of individuals who have an account at Bell. At the time of the strike, Bell had five offices in Omaha, one office in Grand Island, and one office in North Platte.

Before the subject labor dispute, Bell employed 115 people. Twenty-three of those employees were management and support personnel. The remaining 92 Bell employees were members of a bargaining unit which was represented by the Communication Workers of America (CWA).

On May 31, 1989, the contract expired between Bell and its employees represented by the CWA. Fifty-three of the bargaining unit employees struck Bell. The parties stipulated that the workers were unemployed during the period of time from June 12 through June 23, 1989, and that a labor dispute existed during that period of time. The striking employees returned to work on Monday, June 26, 1989.

A number of the striking employees filed applications for unemployment benefits with the Nebraska Department of Labor. Although the record does not state the exact period of time for which the striking employees sought unemployment compensation benefits, it is assumed that the benefits were sought for the period during which the workers were on strike. Benefits were denied by the Deputy Commissioner of Labor on July 14, 1989. On July 31, 1989, that determination was appealed to the Nebraska Appeal Tribunal. A hearing was held before the tribunal on August 28, 1989. The appeal tribunal reversed the deputy commissioner's decision and awarded unemployment compensation benefits to those employees who had applied for them. The decision was served on the parties on October 17, 1989.

On November 13, 1989, Bell filed an appeal from the tribunal's decision in the district court for Douglas County. The district court, on March 2, 1990, affirmed the decision of the

appeal tribunal. However, in affirming the appeal tribunal's decision, the district court asserted, "The standard for review on appeal of such an issue requires that the decision of the appeal tribunal should be affirmed unless it is unsupported by competent and substantial evidence, or is arbitrary or capricious, or the result of an error of law." On March 27, 1990, Bell filed a notice of appeal to this court, along with a docket fee, in the district court.

When the petition instituting proceedings for review under the Administrative Procedure Act is filed in the district court on or after July 1, 1989, the review shall be conducted by the court, without a jury, de novo on the record of the agency. Neb. Rev. Stat. § 84-917(5)(a) (Cum. Supp. 1990). As stated, the petition was filed in district court after July 1, 1989, and the court failed to apply the correct standard of review.

The parties allege that after this appeal was docketed in this court, the district court, on its own motion, set aside its order of March 2, 1990, reconsidered the matter applying the proper standard of review, and entered an order on May 17, 1990, again affirming the appeal tribunal. The district court's docket sheet reflects that the only action taken by the district court after this appeal was docketed was a notice of show cause hearing entered on March 26, 1990. Nonetheless, as correctly pointed out by Bell, any action taken by the district court in this case after this appeal was docketed was void because the district court was divested of jurisdiction. See *Tracy v. United Telephone Co.*, 218 Neb. 331, 353 N.W.2d 273 (1984) (after an appeal has been perfected in this court, the trial court or any other lower tribunal is without jurisdiction to hear a case involving the same matter between the same parties.)

When the petition instituting proceedings for review under the Administrative Procedure Act is filed in the district court on or after July 1, 1989, the judgment rendered or final order made by the district court may be reversed, vacated, or modified by the Supreme Court for errors appearing on the record. Neb. Rev. Stat. § 84-918(3) (Cum. Supp. 1990). It is a logical impossibility for this court to review the district court judgment for errors appearing on the record if the district court incorrectly limited its review and, thus, failed to make factual

determinations, as it must under a de novo on the record review. The district court's and this court's standards of review are interdependent. However, if as a matter of law the evidence was insufficient to demonstrate a stoppage of work, it would not matter that the district court used an improper standard of review because under any standard, a stoppage of work could not be shown. Cf. *Gray v. Fuel Economy Contracting Co.*, 236 Neb. 937, 464 N.W.2d 366 (1991) (although an enhanced burden of proof was imposed by the compensation court panel, this court affirmed the judgment because the evidence was insufficient as a matter of law even under the proper burden of proof).

This court may, therefore, review the record to determine if as a matter of law the evidence was insufficient to demonstrate a stoppage of work.

> An individual shall be disqualified for [unemployment] benefits:
>
> . . . .
>
> (d) For any week with respect to which the commissioner finds that his or her total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he or she was last employed . . . .

Neb. Rev. Stat. § 48-628 (Cum. Supp. 1990).

The parties stipulated that there was a "labor dispute" within the meaning of § 48-628(d). The entire focus of this appeal is on whether Bell suffered a "stoppage of work" as used in § 48-628(d). An employer contesting unemployment benefits has the burden of proving that it suffered a stoppage of work because of a labor dispute. See *IBP, inc. v. Aanenson*, 234 Neb. 603, 452 N.W.2d 59 (1990).

The phrase "stoppage of work" refers to an employer's operations, rather than the employee's labor. *George A. Hormel & Co. v. Hair*, 229 Neb. 284, 426 N.W.2d 281 (1988). "[A] work stoppage exists when it is proven that there has been a substantial curtailment of work produced by a labor dispute in an employing establishment. [Citations omitted.]" *IBP, inc., supra* at 610-11, 452 N.W.2d at 64. In *George A. Hormel & Co., supra* at 289, 426 N.W.2d at 284, this court stated:

"Substantial" has been defined to mean "material," "important," "massive," or "considerable in amount." [Citation omitted.] Accordingly, it becomes difficult to fix any definitive standard by which to gauge when a stoppage of work starts or stops.

In adopting this approach, its effect was to require a case-by-case review of the particular facts and circumstances unique to each case, because we adopted a fluid test to determine when a *substantial* curtailment of work commences, and we remain convinced that this commonsense approach is both logical and reasonable and is the interpretation and application under similar statutes of other jurisdictions. [Citation omitted.]

(Emphasis in original.) See, also, *IBP, inc., supra* (declining to adopt a rigid rule that when a certain percentage decrease in an employer's operations is shown, there is a per se work stoppage). Depending on the facts of the case, various factors become relevant as to the determination of a work stoppage. For example, in *IBP, inc., supra*, which involved a beef slaughtering and processing plant, this court looked to the levels of production, the number of workers employed at the plant, and the number of hours they worked while the dispute was in progress. See, also, *O.C.A.W. UN., Loc. 1-1978 v. Emp. Sec. Div.*, 659 P.2d 583 (Alaska 1983) (citing factors of decreased production, business revenue, service, number of employees, payroll, or man-hours). In other situations where a tangible good is not produced, additional and/or different factors are germane. See, e.g., *Westinghouse Broadcasting Co., Inc. v. Director of the Div. of Employment Security*, 378 Mass. 51, 389 N.E.2d 410 (1979) (broadcasting); *Gas Co. v. Hatcher, Clerk*, 147 W. Va. 630, 130 S.E.2d 115 (1963) (natural gas), *overruled on other grounds*, *Lee-Norse Co. v. Rutledge*, 291 S.E.2d 477 (W. Va. 1982). In the final analysis, the considerations relevant to the determination of a stoppage of work will depend on the unique business involved in a particular case.

As recalled, Bell was composed of seven offices. The first question is whether the offices are to be treated separately or as one unit in determining whether Bell suffered a stoppage of

work. In *IBP, inc., supra,* it was argued that although work ceased at the plant at issue, a work stoppage did not occur because substantially all of the plant's production was absorbed by other IBP plants which operated functionally interdependently. That argument was rejected, and this court construed "establishment," under the facts of the case, to mean the single plant at which operations ceased.

Karen Buche, Bell's vice president of personnel, testified that the North Platte office was not affected by the labor dispute, but that the location at Grand Island was affected by the dispute. No explanation was given as to what was meant by "affected," and no other evidence was offered regarding operations at the Grand Island location.

Two of Bell's Omaha branch offices were closed. A total of five persons were employed by Bell at the two locations. Of the five employees, only one went on strike. Buche testified that the offices were closed to enable the employees to be shifted for work at another facility. All of Bell's facilities were affected by the transfer of employees. Moreover, the closed branch offices were located in telephone company facilities at which members of the same union which struck Bell were employed. From this, the district court, as the fact finder, could reasonably infer that the two branch offices were closed to avoid causing labor strife at the facilities in which they were located. It is for the district court to determine as a factual matter whether the closed branch offices suffered work stoppages because of a labor dispute localized at those establishments.

Out of 115 people employed by Bell, 53 persons went on strike. Buche testified that three temporary workers were hired during the period of the strike. Buche further testified that 14 persons were hired for temporary work in the period of time after April 1 but before the onset of the strike, and that a total of 16 temporary workers were employed during the strike period. The record is silent as to the discrepancy in the number of temporary workers employed during the strike. While Buche denied that the workers were hired to take the place of striking workers, she stated that none of the temporary workers who were providing services during the strike were permanently hired by Bell and that the temporary personnel attempted to do

the work normally performed by the bargaining unit employees.

A work stoppage cannot be determined solely on the basis of the proportionate number of employees affected. As the court in *Gas Co., supra* at 639-40, 130 S.E.2d at 121, explained:

> It is conceivable that in some situations a strike or lockout affecting relatively few employees would produce a stoppage of work if such men were employed in the performance of duties of such vital nature that their unemployment would result in a substantial curtailment of the normal overall activities or operations of the employer. On the other hand, in other situations the unemployment of a proportionately greater number of employees might have no substantial effect on the normal activities of the employer.

We, therefore, do not view the evidence regarding the number of Bell workers separated from employment during the strike as decisive. It is the effect on Bell's operations which is more telling. Bell was composed of the following departments: teller, customer service (Instafacts), accounting, loans, marketing, collections, personnel, real estate loans, and student loans. Bell continued operations in its teller, Instafacts, and loan departments. In the process of staffing those departments by shifting employees, Bell discontinued operations in other departments. Those areas of operation which were continued were the areas in which Bell had contact with its members (customers). There was evidence that a credit union primarily profits through its teller and loan areas. The personnel, collection, and marketing departments terminated their operations entirely.

Buche testified that any credit union member who sought a loan was able to make an application during the strike. A small number of loan applications were processed. Loan records were not filed at any Bell location during the time in question. An exhibit showing total approved loans for January through June 1989 in one of Bell's major branch offices reflects that in terms of the number of loans approved, June was the third highest month and that June had the second highest monthly total for approved loans in terms of dollar amounts.

Buche testified that Bell did not have a full staff in the teller area at any location and that teller transactions were reduced by 15 to 20 percent. Buche was unable to state if any of Bell's members were denied an opportunity to make a deposit or withdrawal because of the decreased teller staff. She testified that deposits and withdrawals could be made by means of an automated teller machine or by mail. Kathleen Christianson, the chief steward on the union executive board representing Bell's employees, testified that it was suggested to members of her union and other unions to boycott the tellers by using their automated teller machine cards. Christianson also testified that this practice would decrease teller transactions.

The Instafacts department provides various services to Bell's members, such as providing general and account information, transferring funds, placing "stop payment" orders on checks, and estimating loan payments. The Instafacts department was closed for $2^{1}/_{2}$ days at one of the Omaha branches. Buche did not have any personal knowledge that any Bell member who made an inquiry to the Instafacts department was denied information.

Buche testified regarding a number of areas in which work ceased or was substantially decreased during the strike period. There was no building maintenance performed. Monitoring of overdrawn accounts ceased. No invoices were paid. Bell was unable to provide new or replacement automated teller machine cards. Tracking changes to Bell's members' accounts was limited to stop payment orders on checks. There was evidence that sales of accident and health insurance, travelers checks, and money orders were limited. Bell was unable to perform any work with respect to bad checks.

Buche testified that Bell could not have continued operations and that the National Credit Union Administration, which is Bell's governing agency, expressed concern to Bell about its efficient and proper operation during the strike. However, in a June 20, 1989, letter to Christianson, Bell's president-treasurer, while acknowledging that Bell could not operate indefinitely with temporary employees, wrote Christianson that Bell "is operating at a reduced but satisfactory level."

In view of the fluid test which this court has adopted and the

issues of material fact present in this case, this court cannot determine as a matter of law whether a work stoppage occurred. Therefore, the cause must be remanded to the district court for Douglas County for a de novo review of the record.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.