Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/31/2023 09:06 AM CDT

PINNACLE BANCORP, INC., APPELLANT, V. BRUCE
MORITZ AND NEBRASKA COMMISSIONER
OF LABOR, APPELLEES.

___ N.W.2d ___

Filed March 31, 2023.    No. S-22-326.

1. **Employment Security: Judgments: Appeal and Error.** In an appeal
   from the appeal tribunal to the district court regarding unemployment
   benefits, the district court conducts the review de novo on the record,
   but on review by the Nebraska Court of Appeals or the Nebraska
   Supreme Court, the judgment of the district court may be reversed,
   vacated, or modified for errors appearing on the record.
2. **Judgments: Appeal and Error.** When reviewing a judgment for errors
   appearing on the record, the inquiry is whether the decision conforms to
   law, is supported by competent evidence, and is neither arbitrary, capri-
   cious, nor unreasonable.
3. ____: ____. Whether a decision conforms to law is by definition a ques-
   tion of law, in connection with which an appellate court reaches a con-
   clusion independent of that reached by the lower court.
4. ____: ____. An appellate court, in reviewing a district court judgment
   for errors appearing on the record, will not substitute its factual find-
   ings for those of the district court where competent evidence supports
   those findings.
5. **Employment Security.** The Employment Security Law is to be liberally
   construed so that its beneficent purpose of paying benefits to involun-
   tarily unemployed workers may be accomplished.
6. **Employment Security: Words and Phrases.** "Misconduct," for pur-
   poses of Neb. Rev. Stat. § 48-628.10 (Reissue 2021), includes behavior
   which evidences (1) wanton and willful disregard of the employer's
   interests, (2) deliberate violation of rules, (3) disregard of standards of
   behavior which the employer can rightfully expect from the employee,
   or (4) negligence which manifests culpability, wrongful intent, evil

design, or intentional and substantial disregard of the employer's interests or of the employee's duties and obligations.

7. **Employment Security: Negligence.** An employee's actions do not rise to the level of misconduct if the individual is merely unable to perform the duties of the job, but must involve at least culpable negligence, which, on a sliding scale, is much closer to an intentional disregard of the employer's interests than it is to mere negligence.

8. **Employment Security: Proof.** An employer does not meet its burden of proving misconduct connected with the employee's work by simply showing the employee was discharged for violating a rule, policy, or order.

9. **Employment Security.** Violation of an order is misconduct only if the order was reasonable under all the circumstances.

10. ____. An employer's rule of conduct must clearly apply to off-duty conduct before its violation constitutes misconduct of such a degree to render the employee ineligible to partake in the beneficent purposes of the Employment Security Law.

11. ____. Misconduct connected with work is a breach of a duty owed to the employer, not to society in general.

Appeal from the District Court for Sarpy County: George A. Thompson, Judge. Affirmed.

Leigh Campbell Joyce, of Baird Holm, L.L.P., for appellant.

Douglas R. Novotny, of Novotny Law, L.L.C., and Katie S. Thurber for appellees.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Engelman, District Judge.

Freudenberg, J.
## INTRODUCTION
At issue in this appeal is whether social media posts directed toward local public figures from a public account of an officer of a local bank constituted misconduct in connection with work disqualifying the employee from unemployment benefits. The reason for the employee's termination was that the posts violated the employer's social media policy. The posts were not sent from work, during work hours, or using the employer's

equipment. The posts did not contain information obtained in the capacity as an employee, mention the employee's position at the bank, or refer to coworkers or customers. The district court determined the posts were made to the employee's account but were not connected to the employee's work. Finding no error on the record, we affirm.

## BACKGROUND

Bruce Moritz was employed at Pinnacle Bancorp, Inc. (Pinnacle), as an internal audit supervisor and was considered a bank officer. He began his employment with Pinnacle in 2018.

### SOCIAL MEDIA POSTS

In May 2021, Pinnacle received several complaints regarding activity on Moritz' social media account during a local mayoral debate. The posts were made under a Twitter account, "Bruce Moritz @brucemoritz." It was a public account.

The posts did not mention Pinnacle. Nevertheless, Moritz' connection to Pinnacle was discovered by the people making the complaints after finding that information on a separate social media platform, LinkedIn. Moritz' LinkedIn account also utilized his full name. LinkedIn listed his position at Pinnacle.

The Twitter posts tagged the incumbent mayor, whose husband had recently died from suicide. In one post, it was suggested the mayor "take your husband's lead . . . he had a good idea." Another post stated that "your husband couldn't stand you why should we?" and that "everyone will blow their brains out if you're still the mayor."

Pinnacle confirmed Moritz was the owner of the Twitter account after seeing a picture posted on the account of Moritz' son attending a local basketball game. Pinnacle's investigation revealed other posts on Moritz' Twitter account beginning in 2020 in which disparaging remarks were made about public figures. The posts included calling the chief executive officer of a local hospital "fat" and calling a politician a

"cunt" who had "tried to [expletive]" a former political com-
mentator's "corpse to attempt to extract sperm and create
the antichrist."

In a short telephone conversation on May 3, 2021, Pinnacle
informed Moritz he was being terminated from his employment
because of his social media activity. Moritz was not told what
the posts were or on what platform they were made. Moritz
asked if there was room for discussion and was told that there
was not.

## Pinnacle's Social Media Policy

A two-page social media policy updated and published in
March 2021 applied to all employees, but further stated that
"[o]fficers of the bank and their significant others have addi-
tional responsibilities as the viewpoints they express on social
media may be interpreted by customers and the community
as the Bank's viewpoints." This language respecting officers
was new. Otherwise, the previous 2018 policy and the updated
2021 policy provided the same general social media provisions
as follows:

> The same principles and guidelines found in the Bank's
> policies apply to your activities online. Ultimately, you
> are solely responsible for what you post online. Before
> creating online content, consider some of the risks and
> rewards that are involved. Keep in mind that any of your
> conduct that adversely affects your job performance, the
> performance of fellow employees or otherwise adversely
> affects employees, customers, suppliers, people who work
> on behalf of the Bank or the Bank's legitimate busi-
> ness interests may result in disciplinary action up to and
> including termination.
>
> Carefully read these guidelines and the Bank's other
> policies and ensure your postings are consistent with
> these policies. Always comply with our Code of Conduct
> and Ethics and never reveal information about a cus-
> tomer or other confidential information. Inappropriate

postings that may include discriminatory remarks, harassment, and threats of violence or similar inappropriate or unlawful conduct will not be tolerated and may subject you to disciplinary action up to and including termination.

Always be fair and courteous to fellow employees, suppliers and people who work on behalf of the Bank. Also, keep in mind that you are more likely to resolve work-related complaints by speaking directly with your co-workers or by utilizing our open door policy than by posting complaints to a social media outlet. Nevertheless, if you decide to post complaints or criticism, avoid using statements, photographs, video or audio that reasonably could be viewed as malicious, obscene, threatening or intimidating, that disparage employees or suppliers, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, color, religion, sex, pregnancy, national origin, age, disability, military status, genetic information, marital status, sexual orientation, or any other status protected by law or Bank policy.

## CLAIM FOR UNEMPLOYMENT BENEFITS

Moritz submitted with the Nebraska Department of Labor (Department) an application for unemployment benefits. In what appears to be an electronic questionnaire submitted to the Department by Moritz, Moritz described that he had been accused of violating Pinnacle's social media policy and that he did in fact violate Pinnacle's social media policy; however, he was unaware such policy existed. Moritz stated: "I published inappropriate messages on Twitter which violated [Pinnacle's] Social Media policy. When management/ownership found this information, I was terminated immediately. Prior to this incident I had never been reprimanded. I

was being considered for a promotion at the time the incident took place." The Department determined that Moritz was disqualified for benefits for the week in which the discharge occurred plus 14 weeks. This was a result of its finding that Moritz had been discharged from his job for misconduct in connection with his work. The total amount of unemployment benefits reduced as a result of this determination was $6,384.

## Appeal Tribunal

Moritz filed an appeal with the Department's Nebraska Appeal Tribunal (Tribunal). As his reason for appeal, he provided: "Reason for termination did not occur at work or during work hours. I was not aware of policy." A telephonic hearing was held before an administrative law judge.

Pinnacle's vice president of human resources testified at the hearing that the specific language of Pinnacle's social media policy, which Pinnacle determined Moritz had violated, was in both the 2018 and 2021 versions of the social media policy and stated: "'Inappropriate postings that include discriminatory remarks or constitute harassment, hate speech, whether or not they include profane/obscene language, threats of violence or similar inappropriate or unlawful conduct will not be tolerated and may be subject to disciplinary action up to and including termination.'" She explained Pinnacle's decision to terminate Moritz' employment was based on the posts regarding the mayor's husband's suicide. Other posts "were more confirmation that this — those were not a unique situation."

The Tribunal received into evidence Moritz' acknowledgment of receiving a copy of the employee handbook and that he was to follow Pinnacle's policies, which acknowledgment Moritz had signed in 2018. It also received into evidence a copy of the social media policy in effect in 2018, the 2021 handbook changes and updated social media policy, and an email directing all Pinnacle employees to the 2021 handbook updates, including, specifically, the modification of

the "social media policy to address added expectations for Officers and clarification for unacceptable posts." It received into evidence the social media posts and the complaints about the posts. The vice president of human resources explained that all Pinnacle institutions share the same social media policy, which is accessible to employees on the "shared drive" and the internet. Moritz would have been either given a physical copy of the handbook or directed to an electronic copy before acknowledging it.

Moritz, who also testified at the hearing, asserted the posts were not related to any work he performed for Pinnacle and did not involve bank employees, customers, or Pinnacle itself. Moritz also raised for the first time an assertion that he did not make the social media posts at issue. Moritz submitted an "exhibit" in which he asserted he did not make the posts in question and they "could have been made by someone who hacked my account or created an account to look like mine." He claimed he "rarely if ever use[s] Twitter and was not aware of those posts being made in my name."

Moritz testified at the hearing that he did not make the posts. Moritz testified he opened the subject Twitter account in 2008 or 2009 and was not actively using it in 2021. He testified he was "not aware of anything — any activity that was going on with it." He theorized either that the posts could have come from an account that was created to look as a duplicate of an account or that his name and password were hacked. Moritz testified he had tried to research and find out what had happened, but he was not able to find any answers.

Moritz explained that immediately after his employment was terminated, he looked up his name on Twitter and found the posts. Moritz testified that he then tried to log in to the Twitter account, using "a couple email addresses and several password combinations," but was unsuccessful. When cross-examined as to how he knew to look up his name on the Twitter platform, given that Pinnacle did not tell him which social media platform the subject posts were on, he responded, "I

searched very quickly after [being terminated] for my name in every conceivable platform that I could think of or I was aware that I, at some point in time, had access to."

It was undisputed at the hearing that Pinnacle did not ask Moritz if he was responsible for the posts when terminating his employment. During the conversation communicating Moritz' termination, Moritz did not deny making the social media posts, but Moritz explained he "was so devastated and so crushed and destroyed" that he was "frankly, just reeling and in a very emotional state" "trying to piece together what had happened." Moreover, Moritz pointed out it was "made . . . quite clear" that Pinnacle was not giving him "a second opportunity and just some way to be able to explain." Moritz admitted that after discovering the posts and learning that he could not log in to his account, he did not attempt to reach out to Pinnacle and explain he was not in control of the account and did not make the posts.

The vice president of human resources testified that shortly after the conversation communicating to Moritz his termination of employment, Pinnacle checked the Twitter account. Pinnacle found the account had been deleted. On cross-examination, Moritz was asked, "Are you aware that, within minutes of [the] conversation [terminating your employment], that account was deleted?" Moritz answered, "No, I was not." When the judge later asked if Moritz discovered the Twitter account had been deleted when he saw the posts under his name and tried to log into that account after being terminated, Moritz answered, "Basically, since — yes, I did find that it has now been deleted."

The Tribunal reversed the "Notice of Determination" and held that Moritz was entitled to benefits for the weeks claimed. The Tribunal concluded it did not need to resolve the issues of whether Moritz made the posts or whether the posts violated a clear written policy of the employer because, even assuming both were true, the social media posts were not

connected with the claimant's work as required under Neb. Rev. Stat. § 48-628.10 (Reissue 2021).

The Tribunal found that the posts were made in Moritz' personal capacity. There was no evidence the posts were sent from work, during work hours, or using the employer's equipment. Furthermore, the subject matter of the posts was not related to Moritz' work or job duties as an auditor and did not reference the employer, use information obtained in Moritz' capacity as an employee, or specifically refer to another employee or known customer of the employer. There was also no evidence that Moritz ever used the social media account for any work-related purpose or that he used his position at Pinnacle to increase the reach or credibility of the social media account. Although Pinnacle's customers discovered Moritz was an employee of Pinnacle, the Tribunal observed they did so only by conducting their own internet research.

The Tribunal further found that while the complaints to Pinnacle showed a likelihood that Moritz' continued employment would have reflected poorly on Pinnacle, "the potential for this kind of reputational harm alone is insufficient to transform off-duty conduct of an employee into conduct connected to the employee's work."

Pinnacle's social media policy, explained the Tribunal, was insufficient to transform Moritz' personal social media postings into misconduct connected with his work. The Tribunal observed the broadness of the policy, which left Pinnacle with "significant discretion to regulate the off-duty speech of its employees."

While the Tribunal did "not suggest that it was improper for [Pinnacle] to fire [Moritz] for the conduct in question," disqualification under § 48-628.10 applies only to a limited subset of justifiable terminations, and "[a]n employer cannot transform off-duty conduct into conduct connected to work simply by adopting a broad policy attempting to regulate off-duty conduct."

### District Court

Pinnacle filed a petition for review of the Tribunal's decision pursuant to Neb. Rev. Stat. § 84-917 (Cum. Supp. 2022) of the Administrative Procedure Act.[1] It asked that the district court reverse the determination of the Tribunal and find that Moritz is disqualified from receiving unemployment compensation benefits due to having engaged in misconduct or gross misconduct.

Following a hearing, in its de novo review, the district court adopted the findings of fact by the Tribunal. It affirmed the Tribunal's decision that, assuming without deciding Moritz made the posts, Moritz was discharged under nondisqualifying conditions and was therefore entitled to benefits for the weeks claimed, if otherwise eligible. The court reasoned that Moritz' "misconduct, if assumed true, was totally divorced from his position with Pinnacle and . . . was not connected with his work." Pinnacle appeals.

### ASSIGNMENTS OF ERROR

Pinnacle assigns that the district court erred (1) when it held that Moritz' online misconduct was not connected to his employment, (2) in ruling that Moritz was not disqualified from receiving unemployment benefits, and (3) in failing to make a finding that Moritz had created the social media posts that resulted in his employment's termination.

### STANDARD OF REVIEW

[1,2] In an appeal from the appeal tribunal to the district court regarding unemployment benefits, the district court conducts the review de novo on the record, but on review by the Nebraska Court of Appeals or the Nebraska Supreme Court, the judgment of the district court may be reversed, vacated, or modified for errors appearing on the record.[2]

---

[1] See Neb. Rev. Stat. §§ 84-901 through 84-920 (Reissue 2014 & Cum. Supp. 2022).

[2] *Badawi v. Albin*, 311 Neb. 603, 973 N.W.2d 714 (2022).

When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[3]

[3] Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court.[4]

[4] An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings.[5]

ANALYSIS

[5] The Employment Security Law is to be liberally construed so that its beneficent purpose of paying benefits to involuntarily unemployed workers may be accomplished.[6] Section 48-628.10 provides that an employee discharged for "misconduct connected with [the employee's] work" is subject to a partial disqualification. Further, if that misconduct was "gross, flagrant, and willful, or was unlawful,"[7] the employee is totally disqualified from receiving benefits with respect to wage credits earned prior to discharge for such misconduct. Thus, under § 48-628.10, to determine whether an employee is partially or totally ineligible for benefits, one must consider (1) whether there was an act of proven misconduct and (2) whether the misconduct was connected with the employee's work.

[6,7] "Misconduct" is not defined in § 48-628.10, but we have long defined misconduct to include behavior which

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] See, e.g., *Great Plains Container Co. v. Hiatt*, 225 Neb. 558, 407 N.W.2d 166 (1987).

[7] § 48-628.10(3).

evidences (1) wanton and willful disregard of the employer's interests, (2) deliberate violation of rules, (3) disregard of standards of behavior which the employer can rightfully expect from the employee, or (4) negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard of the employer's interests or of the employee's duties and obligations.[8] We have explained that an employee's actions do not rise to the level of misconduct if the individual is merely unable to perform the duties of the job,[9] but must involve at least "culpable negligence," which, "on a sliding scale," "is much closer to an intentional disregard of the employer's interests than it is to mere negligence."[10]

This test of misconduct was developed under case law involving acts occurring during scheduled working hours and having an easily discernible direct effect on the employer's business interests. Disqualifying misconduct under such circumstances has included unexcused or excessive absences that are harmful to the employer,[11] fraudulent or falsified work reports or receipts,[12] and the deliberate disobedience of reasonable directions directly connected to the quality of the work product.[13]

---

[8] *Badawi v. Albin, supra* note 2.

[9] *Meyers v. Nebraska State Penitentiary*, 280 Neb. 958, 791 N.W.2d 607 (2010).

[10] *Maxon v. City of Grand Island*, 273 Neb. 647, 656, 731 N.W.2d 882, 889 (2007).

[11] See, *O'Keefe v. Tabitha, Inc.*, 224 Neb. 574, 399 N.W.2d 798 (1987); *McCorison v. City of Lincoln*, 215 Neb. 474, 339 N.W.2d 294 (1983). See, also, *Tuma v. Omaha Public Power Dist.*, 226 Neb. 19, 409 N.W.2d 306 (1987); *Strauss v. Square D Co.*, 201 Neb. 571, 270 N.W.2d 917 (1978).

[12] See, *Caudill v. Surgical Concepts, Inc.*, 236 Neb. 266, 460 N.W.2d 662 (1990); *Smith v. Sorensen*, 222 Neb. 599, 386 N.W.2d 5 (1986).

[13] See *Bristol v. Hanlon*, 210 Neb. 37, 312 N.W.2d 694 (1981), *overruled on other grounds, Heimsoth v. Kellwood Co.*, 211 Neb. 167, 318 N.W.2d 1 (1982).

[8,9] Fewer cases under the Employment Security Law have involved acts occurring while off duty. The relevant statutes do not define "connected with [the employee's] work," as stated in § 48-628.10(3), and we have not set forth a list of elements or an explicit definition for this concept. Some of the elements of our test for "misconduct," however, describe some connection to the employer's interests by referencing disregard of the employer's interests or standards the employer can rightfully expect from the employee and either culpable negligence or substantial disregard with respect to the employer's interests or the employee's duties. Further, we have clarified that deliberate violation of rules will not be misconduct connected with the work without the rules' being reasonably designed to protect the employer's business relationship.[14] An employer does not meet its burden of proving misconduct connected with the employee's work by simply showing the employee was discharged for violating a rule, policy, or order.[15] We have also noted with approval decisions of the Tribunal designated by the Department as precedential and which reason that violation of an order is misconduct only if the order was reasonable under all the circumstances.[16]

In cases exploring whether a policy or order governing off-duty conduct is reasonable, we have weighed the likely effect on an employer's interests against the imposition upon the employee's private life. For instance, we held in *Snyder Industries, Inc. v. Otto*[17] that it was not misconduct connected with the employee's work to violate a company rule forbidding all contact between current employees and ex-employees. Although adopted in response to numerous leaks

---

[14] See *Badawi v. Albin, supra* note 2.

[15] See *id.*

[16] See *Badawi v. Albin, supra* note 2, citing 224 Neb. Admin. Code ch. 1, § 019 (2014). See, also, *In re Marshall*, 12 Neb. App. Trib. 5030 (2012); *In re Svoboda*, 04 Neb. App. Trib. 0258 (2004); *In re Broomfield*, 91 Neb. App. Trib. 0707 (1991).

[17] *Snyder Industries, Inc. v. Otto*, 212 Neb. 40, 321 N.W.2d 77 (1982).

of information from the business to competitors, we found that the rule did not bear a reasonable relationship to the employer's interests.

In so holding in *Snyder Industries, Inc.*, we did not deny there might be a relationship between the employer's interests and the prohibition. Nevertheless, we focused on the extent of that relationship in comparison to the impact on employees' personal lives. We said it was "more logical to believe" that production secrets were being obtained by competitors "by the hiring away of [its] employees," and the rule forbidding association of current employees with former employees "would not prevent such practices."[18] "Furthermore," we explained, "the basis for the rule involved loses all sense of reason when one substitutes husband and wife, or father and son, for the two friends involved in the relationship forbidden here,"[19] implying that such an intrusion into an employee's private life would be patently absurd. We said, "We do not believe that a rule which forbids *all* contact between friends and acquaintances in the interest of preventing 'leaks' of production secrets simply on the basis that one or the other is no longer an employee of the company bears a reasonable relationship to the employer's interest."[20]

Similarly, in *Great Plains Container Co. v. Hiatt*,[21] we held that a violation of a work policy prohibiting excessive garnishments was not misconduct connected with the employee's work. We conceded that excessive garnishments might be a nuisance to an employer, and thus have some negative impact on the employer. Nevertheless, we pointed out that the garnishments were the result of the employee's conduct in "his private life."[22] We held the employee's violation of the

---

[18] *Id*. at 44, 321 N.W.2d at 80.

[19] *Id.*

[20] *Id.*

[21] *Great Plains Container Co. v. Hiatt, supra* note 6.

[22] *Id.* at 561, 407 N.W.2d at 169.

rule prohibiting excessive garnishments did not bear a "'reasonable application and relation to the employee's task[s]'" at work.[23]

In contrast to *Snyder Industries, Inc.*, and *Hiatt*, we held in *Jensen v. Mary Lanning Memorial Hosp.*[24] that a nursing assistant committed misconduct connected with her work by continuing to disregard her employer's warnings that her off-duty consumption of alcohol should not be detectible by patients when she was working. We explained that regardless of whether the nursing assistant was intoxicated on the job, it was "not unreasonable" for the hospital where she worked to require she report to work without the odor of alcohol on her breath.[25] We explained that the nursing assistant necessarily came into close personal contact with patients who could be distressed by the odor and lose confidence in the abilities of the hospital's employees to properly care for them.

In *Dolan v. Svitak*[26] and *Poore v. City of Minden*,[27] we found that illegal off-duty conduct bore a reasonable relationship to the employees' work. In *Dolan*, we held that off-duty illegal drug use was misconduct connected with the employee's work even if it did not affect the employee's work performance. The employee had failed drug testing conducted under a clear employer policy of which the employee had been notified. We explained that the drug-free policy of the company, adopted to enhance the company's reputation in the community by showing it had taken a visible stand against illegal drug use, was reasonably designed to protect the employer's business relationship.

---

[23] See *id.* at 562, 407 N.W.2d at 170.

[24] *Jensen v. Mary Lanning Memorial Hosp.*, 233 Neb. 66, 443 N.W.2d 891 (1989).

[25] *Id.* at 70, 443 N.W.2d at 894.

[26] *Dolan v. Svitak*, 247 Neb. 410, 527 N.W.2d 621 (1995). See, also, *Douglas Cty. Sch. Dist. 001 v. Dutcher*, 254 Neb. 317, 576 N.W.2d 469 (1998).

[27] *Poore v. City of Minden*, 237 Neb. 78, 464 N.W.2d 791 (1991).

In *Poore*, the off-duty theft by a city sanitation worker of the city's electrical and water services was found to be misconduct connected with the employee's work. We held the theft "was directly related to the employee's ability to handle his duties"[28] because of "the relationship existing between a governmental unit and its citizens" was such that "[t]oleration of such conduct by a governmental employer would reflect unfavorably upon the employer in the eyes of the public."[29]

We have not addressed under what circumstances off-duty social media discourse is misconduct connected with the employee's work. Other jurisdictions have adopted a multiple-element test when faced with social media and similar conduct occurring as part of the employee's private life. Under this test, the employer must show by a preponderance of the evidence that the off-duty conduct (1) had some nexus to the work, (2) resulted in some harm to the employer's interests, and (3) was in fact conduct which was (a) violative of some code of behavior contracted between employer and employee and (b) done with intent or knowledge that the employer's interests would suffer.[30] Harm in this context has included potential and intangible harm.[31] The code of behavior at issue cannot be impliedly contracted, but it need not be a formal written contract.[32] Courts have also pointed out that misconduct connected with work is a breach of duty owed to the

---

[28] *Id.* at 87, 464 N.W.2d at 797.

[29] *Id.* at 87, 464 N.W.2d at 796.

[30] See, *Martinez v. Dir., Dep't of Workforce Servs.*, 2015 Ark. App. 717, 2, 478 S.W.3d 276 (2015); *Kirby v. Washington State Dept. of Empt.*, 185 Wash. App. 706, 342 P.3d 1151 (2014); *Miller v. Kansas City Station Corp.,* 996 S.W.2d 120 (Mo. App. 1999); *Matter of Kotrba*, 418 N.W.2d 313 (S.D. 1988). See, also, 76 Am. Jur. 2d *Unemployment Compensation* § 79 (2016); Annot., 18 A.L.R.6th 195 (2006). But see *Collingsworth General Hosp. v. Hunnicutt*, 988 S.W.2d 706 (Tex. 1998).

[31] See *Kirby v. Washington State Dept. of Empt., supra* note 30.

[32] See *id.*

employer, to be distinguished from society in general.[33] The off-duty conduct must have "significantly infringed on legitimate employer expectations" for it to be connected with the employer's work.[34]

Off-duty social media posts have consistently been found to be misconduct connected with employees' work when they involve a relatively direct reference to employees or customers of the employer and violate an employer policy or standard of behavior.[35] For instance, in *Jackson-George Regional Library v. Empl. Security*,[36] the court held that a library employee committed misconduct connected with her work by posting on Facebook a compromising picture of an unidentified library patron, in violation of her employer's policy to maintain strict confidentiality of all customer information. Likewise, the court in *Jackson v. Walgreen Co.* held that an employee committed misconduct connected with his work by posting to a coworker's Facebook page a pornographic video that the employee called an "'expose'" of two other coworkers, identified by their first names, in violation of a policy prohibiting online harassment, including sexual innuendo, of team members.[37]

Though stated as a hypothetical about the broad category of patients, a social media post by a nurse was found in *Talbot v. Desert View Care Center*[38] to constitute misconduct

---

[33] *Weaver v. Wallace,* 565 S.W.2d 867 (Tenn. 1978).

[34] *Rodman v. New Mexico Employment Sec. Dept.*, 107 N.M. 758, 761, 764 P.2d 1316, 1319 (1988).

[35] See, *Cummins v. Unemployment Comp. Bd. of Rev.*, 207 A.3d 990 (Pa. Commw. 2019); *Jackson-George Library v. Empl. Security*, 226 So. 3d 133 (Miss. App. 2017); *Beagan v. RI Dept. of Labor and Training*, 162 A.3d 619 (R.I. 2017*)*; *Jackson v. Walgreen Co.*, 516 S.W.3d 391 (Mo. App. 2017); *Talbot v. Desert View Care Center*, 156 Idaho 517, 328 P.3d 497 (2014).

[36] *Jackson-George Library v. Empl. Security, supra* note 35.

[37] *Jackson v. Walgreen Co., supra* note 35, 516 S.W.3d at 394.

[38] *Talbot v. Desert View Care Center, supra* note 35.

connected with the nurse's employment at a care center. The nurse had posted on Facebook, while off duty, about whether anyone ever had "'one of those days'" where you would like to "'slap the ever loving bat snot out of a patient who is just being a jerk.'"[39] The court found the post violated the employer's social media policy prohibiting intimidating, threatening, or other "bullying" behaviors electronically toward facility stakeholders.[40]

In *Cummins v. Unemployment Comp. Bd. of Rev.*,[41] threatening posts toward a coworker, which posts other coworkers viewed, were found to be misconduct connected with the employee's work. The employee posted on Facebook, while off duty, that she would have "'sliced [her plant manager's] throat open'" if their confrontation had not happened at work.[42] The court noted that although the post did not mention the name of the company or the coworker, coworkers had access to the social media account and understood to whom it referred. The court also discussed that although the statement was perhaps not a threat that would constitute a violation of the law or of the rules of the social media platform where the post was made, the employees who read the post took it seriously and feared for their coworker's safety. The court found the statements, which were overtly menacing toward a supervisor in response to a confrontation at work, disregarded the standard of behavior an employer can rightfully expect of an employee.

In contrast to the facts of these cases, when posts have not directly concerned a coworker, explicitly identified the employer, or directly concerned an individual customer or customer group, no court has found off-duty social media

---

[39] *Id.* at 519, 328 P.3d at 499.

[40] *Id*. at 522, 328 P.3d at 502.

[41] *Cummins v. Unemployment Comp. Bd. of Rev., supra* note 35.

[42] *Id*. at 993.

discourse to be misconduct connected with the employee's work.[43] In this context, employers' social media or similar policies purportedly governing off-duty behavior have been strictly construed.[44] While the posts may have been inappropriate, harmed the employer's business relationships, and justified discharge from employment, courts have held under the facts presented that there was too weak of a connection with the employee's work to rise to the level of disqualifying misconduct for the purpose of state unemployment benefits.[45]

Thus, in *Waverly Hts., Ltd. v. Unemployment Bd. of Review*,[46] the court upheld the determination that an employee, a vice president of human resources for a company outside of Philadelphia, Pennsylvania, did not commit willful misconduct by posting on Twitter that she was a "'VP of HR in a comp outside of philly an informal survey of our employees shows 100% AA employees voting'" for the tagged presidential candidate. While the post did not identify the company, it was shown that additional research efforts could reveal which company the employee worked for. The company, which apparently did not wish to get involved in politics, had a social media policy to protect its reputation and confidentiality of its employees as depicted in social media, requiring that employees who identified themselves with the employer in social media conduct themselves according to this policy. The court interpreted the policy language strictly and found the employee did not violate it because she did not explicitly identify

---

[43] See, *Waverly Hts. v. Unemployment Bd. of Review*, 173 A.3d 1224 (Pa. Commw. 2017); *Beagan v. RI Dept. of Labor and Training, supra* note 35; *Martinez v. Dir., Dep't of Workforce Servs., supra* note 30; *Kirby v. Washington State Dept. of Empt., supra* note 30.

[44] See *id.*

[45] See *id.*

[46] *Waverly Hts. v. Unemployment Bd. of Review, supra* note 43, 173 A.3d at 1226.

her employer in the post or otherwise hold herself out as a representative of the employer on her social media page.

In *Kirby v. Washington State Dept. of Empt.*,[47] the court upheld the agency's finding that a rancorous off-duty post about the employer's customer base was not misconduct connected with the employee's work for purposes of unemployment benefits, when employer policies did not explicitly encompass such conduct. A security guard was discharged for posting on Facebook while off duty, that she did not "'give [an expletive] about a police officer that got shot,'" that "'ppl prolly quit shootin em all the goddamn time'" if the police would stop shooting people, and "'karmas a bitch.'"[48] The approximately 100 people designated as her "friends" and having direct access to the comment included a coworker who reported the message.

The court in *Kirby* reasoned that the agency did not err in finding the employer had failed to demonstrate the element of nexus between the post and the employee's work. The post was made while the employee was off duty and at home, did not mention the job or the employer, and was only accessible to her "friends." The court recognized there was potential to harm the relationship with the employer's client that included law enforcement. Nevertheless, harm to the employer is but one element of whether the conduct was connected with one's work and not to be conflated with nexus. The court also found the employer had failed to demonstrate that the employee's post, an expression of the employee's personal opinion, was made with intent or knowledge that her employer's interest would suffer. Finally, the court found the employer had failed to demonstrate the employee violated rules generally requiring positive relationships with law enforcement and professionalism, courtesy, and respect. The court explained

---

[47] *Kirby v. Washington State Dept. of Empt., supra* note 30.

[48] *Id.* at 711, 342 P.3d at 1153.

that not only must the rules governing off-duty conduct be reasonable, they cannot be implied or impliedly violated, and the employer had failed to explain how its rules reasonably extended to off-duty, off-site social media posts.

For the sake of completeness, the court in *Kirby* went on to hold, for the same reasons, that the employee had not committed misconduct in the first instance. Misconduct was defined by regulations as including "'[d]eliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee'" and "'[c]arelessness or negligence of such degree or recurrence to show an intentional or substantial disregard of the employer's interest.'"[49]

[10] We agree that an employer's rule of conduct must clearly apply to off-duty conduct before its violation constitutes misconduct of such a degree to render the employee ineligible to partake in the beneficent purposes of the Employment Security Law.[50] Overly broad or vague policies governing off-duty conduct generally fail to bear a reasonable relationship to business interests and are not reasonable under all the circumstances.

[11] No one disputes on appeal that the posts at issue here were an inappropriate and offensive means of political discourse. However, misconduct connected with work is a breach of a duty owed to the employer, not to society in general, and we cannot create special rules for what we may find distasteful. That the off-duty posts were more vitriolic than civil is relevant only to the extent the tone of the off-duty discourse violated a clear prohibition by Pinnacle, which was reasonable under all the circumstances and reasonably designed to protect Pinnacle's business relationships. The district court adopted the Tribunal's finding that the breadth of Pinnacle's social media policy, which left Pinnacle with "significant

---

[49] *Id.* at 724, 342 P.3d at 1159.

[50] See, e.g., *Great Plains Container Co. v. Hiatt, supra* note 6.

discretion to regulate the off-duty speech of its employees," was insufficient to transform Moritz' personal social media postings into misconduct connected with his work. We cannot say this was error on the record.

To resolve this appeal, it is not necessary to pass on the enforceability of Pinnacle's social media policy, and we express no opinion on that issue. Nor do we pass on whether there are any circumstances under which a violation of Pinnacle's social media policy would be sufficiently connected to Moritz' work to support a finding of disqualifying misconduct under §48-628.10. Instead, on this record, we find no error in the district court's conclusion that Moritz' off-duty social media posts did not amount to misconduct under § 48-628.10 because they were not sufficiently connected to his work. There was no evidence the posts were made during work hours or using work equipment and no evidence the posts affected the work performance of any Pinnacle employee. There was no evidence the social media posts were related to Pinnacle, its employees, its customers or potential customers, or its business activities and interests. And there was no evidence the social media posts were reasonably calculated to identify Moritz as a Pinnacle employee or to violate any local, state, or federal laws.

We thus affirm the district court's determination that the posts were part of Moritz' personal life, "totally divorced" from his work, which posts could not be reasonably connected with work through Pinnacle's broadly worded social media policy. Like in *Snyder Industries, Inc.*, and *Great Plains Container Co.*, there was some inconvenience and potential harm to Pinnacle as a result of Moritz' off-duty conduct, but the broad infringement upon Moritz' private life was not justified by a clearly articulated employer expectation that was reasonably related to Moritz' work.

Again, the category of acts giving an employer cause to discharge an employee from employment is much larger

than the category of acts that disqualify the discharged employee from these statutorily established unemployment benefits. This opinion's analysis is limited to the denial of such benefits and should not be interpreted to be applicable to the disputed discharge of an employee.

Because Moritz did not commit misconduct connected with his work, he could not have committed gross misconduct connected with his work. And we do not reach Pinnacle's assignment of error concerning the lack of findings of the authorship of the posts, because that is not determinative of the outcome of this appeal.

CONCLUSION

The district court did not err in finding that Moritz did not commit misconduct connected with his work and, accordingly, that he was not disqualified from unemployment benefits. We affirm.

Affirmed.

Miller-Lerman, J., not participating.

Cassel, J., dissenting.

I respectfully dissent. Bruce Moritz (the bank officer) was an officer of Pinnacle Bancorp, Inc. (the bank). The bank's policy established social media expectations for bank officers. The bank officer posted abhorrent comments, which the bank's customers connected with it, causing harm to its reputation. Its policy had sought to prevent such harm.

After an initial administrative partial disqualification of the bank officer's benefits under the Employment Security Law (ESL),[1] based upon "misconduct connected with [the bank officer's] work,"[2] an administrative appeal reversed the disqualification. The appeal tribunal did not make complete findings of fact. Upon the bank's appeal to the district court

---

[1] See Neb. Rev. Stat. §§ 48-601 to 48-683 (Reissue 2021 & Cum. Supp. 2022).

[2] See § 48-628.10.

under the Administrative Procedure Act (APA),[3] the district court also did not make complete findings of fact but instead relied upon the assumptions of the appeal tribunal and affirmed the appeal tribunal's full award.

On appeal to this court, the majority opinion perceives no connection between the bank officer's abhorrent comments on social media and the bank officer's work. I disagree in light of the applicable standard of review.

Some historical background is necessary before I can set forth the correct standard of review. Unemployment compensation benefits and mandatory unemployment insurance are creatures of statute, unknown to the common law.[4] They are a product of the Great Depression.[5] Nebraska's statute originated in 1937.[6] This court has long held that the ESL is to be liberally construed to accomplish its beneficent purposes.[7]

Because of the statutes applicable prior to July 1, 1989, this court generally did not characterize ESL questions as issues of fact, law, or mixed fact and law. During that period, ESL statutes governed judicial review by the district court,[8] appeal to the Supreme Court (predating the Nebraska Court of Appeals),[9] and the standard of review to be applied by both courts.[10] A proposition of the Nebraska Supreme Court at that time stated: "This court reviews cases regarding unemployment benefits de novo on the record and will retry all

---

[3] See Neb. Rev. Stat. §§ 84-901 to 84-920 (Reissue 2014 & Cum. Supp. 2022).

[4] *Dean v. South Dakota Dept. of Labor*, 367 N.W.2d 779 (S.D. 1985).

[5] *Id*.

[6] See 1937 Neb. Laws, ch. 108, § 1, p. 370.

[7] See, e.g., *Dillard Dept. Stores v. Polinsky*, 247 Neb. 821, 530 N.W.2d 637 (1995); *Hunter v. Miller*, 148 Neb. 402, 27 N.W.2d 638 (1947).

[8] See § 48-638 (Reissue 1984).

[9] See § 48-640 (Reissue 1984).

[10] See § 48-639 (Reissue 1984).

issues of fact and reach an independent conclusion."[11] In one case, without citation, this court said, "We agree that what conduct constitutes 'misconduct' in a given case is a fact question."[12] But otherwise, I have found no published Nebraska decision characterizing ESL questions in one manner or another. And prior to July 1, 1989, it made no difference—all questions were reviewed by this court de novo.

Effective on July 1, 1989, important changes occurred. In the ESL statutes, appeals pursuant to the APA were substituted for district court judicial review[13] and appeal to the Supreme Court,[14] and the ESL-specific standard of review was repealed.[15] At the same time, the standards of review under the APA for the district court[16] and the Supreme Court[17] were essentially swapped.[18] As relevant to this appeal, the "after" standards remain the same.

As relevant here, the ESL statute authorizing appeal to the district court specifies that the appeal shall be "governed by the [APA]."[19] In an APA review proceeding, the district court reviews the agency's decision de novo on the record of the agency and may affirm, reverse, or modify the decision of the agency or remand the case for further proceedings.[20]

---

[11] *Stuart v. Omaha Porkers*, 213 Neb. 838, 838-39, 331 N.W.2d 544, 545 (1983). See, also, *A. Borchman Sons v. Carpenter*, 166 Neb. 322, 89 N.W.2d 123 (1958), *overruled on other grounds, Gilmore Constr. Co. v. Miller*, 213 Neb. 133, 327 N.W.2d 628 (1982).

[12] *Smith v. Sorensen*, 222 Neb. 599, 603, 386 N.W.2d 5, 8 (1986).

[13] See § 48-638 (Reissue 1988).

[14] See § 48-640 (Reissue 1988).

[15] See § 48-639 (Reissue 1988).

[16] See 1989 Neb. Laws, L.B. 213, § 1.

[17] See 1989 Neb. Laws, L.B. 213, § 2.

[18] Cf. 1989 Neb. Laws, L.B. 213, § 1, and 1989 Neb. Laws, L.B. 213 § 2.

[19] § 48-638(2) (Reissue 2021).

[20] *Houghton v. Nebraska Dept. of Rev.*, 308 Neb. 188, 953 N.W.2d 237 (2021).

The standard of review of this court is well settled. A judgment or final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record.[21] When reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[22] Whether a decision conforms to law and the interpretation of statutes present questions of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court.[23]

I digress to observe that this court has long recognized that the lower and higher courts' standards of review are interdependent.[24] "It is a logical impossibility for [an appellate] court to review the district court judgment for errors appearing on the record if the district court incorrectly limited its review and, thus, failed to make factual determinations, as it must under a de novo on the record review."[25]

Only a few years later in an APA appeal, this court stated that the district court was therefore obliged to make an independent determination of the facts without reference to the determinations of fact made by the Nebraska Appeal Tribunal, whose decision was being reviewed.[26] In that case, the Supreme Court determined that the district court's application of the former limited standard of review constituted

---

[21] *Mollring v. Nebraska Dept. of Health & Human Servs., ante* p. 251, 983 N.W.2d 536 (2023).

[22] *Id*.

[23] *Id*.

[24] See *Bell Fed. Credit Union v. Christianson*, 237 Neb. 519, 466 N.W.2d 546 (1991).

[25] *Id*. at 522-23, 466 N.W.2d at 549.

[26] *Law Offices of Ronald J. Palagi v. Dolan*, 251 Neb. 457, 558 N.W.2d 303 (1997).

plain error and required that the cause be remanded to the district court for a de novo review of the record.[27] The same result followed in later appeals.[28] Although it is recognized as plain error, reversal is not always required.[29]

But because that problem may not be recognized until the appeal is before the Supreme Court or Court of Appeals, I suggest that the district court should make complete findings of fact rather than accepting assumptions of an appeal tribunal. Under the right circumstances of such incomplete findings, remand to the district court for such findings may be required.[30]

Here, the district court adopted the findings and reasoning of the appeal tribunal. Consequently, it did not expressly determine that the bank officer posted the social media comments. Instead, it assumed that he did so and that the comments were "misconduct." I do not believe that the majority is inclined to find plain error related to these assumptions. So I return to the issue framed by the majority—whether the assumed misconduct was "connected with [the bank officer's] work."[31]

At this point, it becomes critical to determine whether the question is one of fact, one of law, or a mixed question of fact and law. None of this court's ESL misconduct cases after 1989 furnishes an answer.

This makes a huge difference. If it were a question of fact, the review of this court would be limited to whether it was supported by substantial evidence and was neither arbitrary, capricious, nor unreasonable. That would be a very deferential standard. Some states employ that standard, often based

---

[27] *Id.*

[28] See, *Medicine Creek v. Middle Republican NRD*, 296 Neb. 1, 892 N.W.2d 74 (2017); *Zwygart v. State*, 270 Neb. 41, 699 N.W.2d 362 (2005).

[29] See *Bell Fed. Credit Union v. Christianson, supra* note 24.

[30] See *id.*

[31] See § 48-628.10.

upon the wording of that state's employment security statute.[32] On the other hand, if it were a question of law, no deference would be given to the district court's decision regarding the connection between an employee's misconduct and his or her work. Some states use this approach.[33] Other states' analyses seem to turn upon statutory language.[34]

I conclude that under Nebraska law, the question whether misconduct is connected with an employee's work is a mixed question of fact and law. This approach is used by numerous states.[35] And I believe it is most consistent with the approach used by this court in all of the cases since 1989. Here, in light of the district court's assumptions, there is no real dispute regarding the relevant facts. Thus, it becomes a question of law and I give no deference to the district court's decision on the question of whether the bank officer's misconduct (which was assumed by the district court) was "connected with his . . . work."

Although the district court assumed the existence of misconduct, I assert that that question is itself a mixed one of

---

[32] See, e.g., *Keller v. Ameritel Inns, Inc.*, 164 Idaho 636, 434 P.3d 811 (2019); *Smith v. Sampson*, 816 P.2d 902 (Alaska 1991); *Whitmer v. Dir., Dept. of Workforce Serv's.*, 2017 Ark. App. 367, 525 S.W.3d 45 (2017); *Benard v. Review Bd.*, 997 N.E.2d 1077 (Ind. App. 2013).

[33] See, e.g., *Gilchrist v. Okl. Employment Sec. Com'n*, 94 P.3d 72 (Okla. 2004); *Moody v. Northland Royalty Co.*, 281 Mont. 26, 930 P.2d 1100 (1997); *Rasmussen v. South Dakota Dept. of Labor*, 510 N.W.2d 655 (S.D. 1993); *Markel v. City of Circle Pines*, 479 N.W.2d 382 (Minn. 1992); *Dortch v. Zoltek Corp.*, 493 S.W.3d 18 (Mo. App. 2016).

[34] See, e.g., *Mohamed v. Fletcher Allen Health Care*, 192 Vt. 204, 58 A.3d 222 (2012); *Gillins v. Unemp. Comp. Bd. of Review*, 534 Pa. 590, 633 A.2d 1150 (1993).

[35] See, e.g., *Clark v. Department of Workforce Services*, 378 P.3d 310 (Wyo. 2016); *Lovgren v. Job Service North Dakota*, 515 N.W.2d 143 (N.D. 1994); *Kirby v. State, Dept. of Emp. Sec.*, 179 Wash. App. 834, 320 P.3d 123 (2014); *Hurst v. Department of Employment Sec.*, 393 Ill. App. 3d 323, 913 N.E.2d 1067, 332 Ill. Dec. 777 (2009); *Wells Fargo Alarm Svcs. v. VA Empl. Com'n*, 24 Va. App. 377, 482 S.E.2d 841 (1997).

fact and law. And assuming the relevant facts are true, I certainly agree, as a matter of law, that the bank officer's social media comments were misconduct.

"Misconduct" is not defined in § 48-628.10, but this court has defined it to include behavior which evidences (1) wanton and willful disregard of the employer's interests, (2) deliberate violation of rules, (3) disregard of standards of behavior which the employer can rightfully expect from the employee, or (4) negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard of the employer's interests or of the employee's duties and obligations.[36] This court's original definition of misconduct[37] differs very little from the most recent articulation.[38] This definition has never drawn a legislative amendment or specification. Thus, I presume that the Legislature has acquiesced in this court's definition.[39]

Only one question remains: Was the misconduct "connected with [the bank officer's] work"? I would conclude that it was.

The bank established a social media policy, communicated it to the bank officer and his fellow officers, and employed it to protect the bank's legitimate interests. The policy explained that "social media also presents certain risks and carries with it certain responsibilities." It emphasized that "your social media communications can have either positive or negative impacts upon others." Thus, people "make statements they would never make if speaking directly with someone out of concern that their words might upset or anger the other person." It warned that "you are solely responsible for what you post online."

---

[36] *Badawi v. Albin*, 311 Neb. 603, 973 N.W.2d 714 (2022).

[37] See *Bristol v. Hanlon*, 210 Neb. 37, 312 N.W.2d 694 (1981), *overruled on other grounds, Heimsoth v. Kellwood Co.*, 211 Neb. 167, 318 N.W.2d 1 (1982).

[38] See *Badawi v. Albin, supra* note 36.

[39] See *State v. Webb*, 311 Neb. 694, 974 N.W.2d 317 (2022).

Further, it cautioned that "any of your conduct that adversely affects . . . customers . . . or the [b]ank's legitimate business interests may result in disciplinary action up to and including termination." Thus, it said, "postings that . . . constitute harassment, hate speech (whether or not they include profane/obscene language), threats of violence or similar inappropriate or unlawful conduct will not be tolerated."

Although the social media policy applied to all of the bank's employees, the policy imposed a higher standard on bank officers. It emphasized that "[o]fficers of the bank and their significant others have *additional responsibilities* as the viewpoints they express on social media may be interpreted by customers and the community as the [b]ank's viewpoints." (Emphasis supplied.) In other words, the social media policy, with this higher standard for bank officers, was communicated to the bank officer here.

The majority accepts that the bank officer used a social media platform. The majority accepts that the bank officer posted comments that "referenced the recent suicide of the incumbent Mayor's husband, encouraged the Mayor to follow her 'husband's lead[,'] and said 'your husband couldn't stand you why should we' and 'everyone will blow their brains out if you're still the mayor.'" The majority accepts that the bank received three complaints regarding these posts within 24 hours of when they were posted.

Having been warned by the bank against such social media comments, the bank officer made them anyway. I would conclude that these social media comments were made in "wanton and willful disregard of the employer's interests." They were a "deliberate violation of [the bank's] rules" regarding social media. The bank officer made the comments in "disregard of standards of behavior which the [bank] can rightfully expect from the [bank officer]." And they "manifest[ed] . . . intentional and substantial disregard of the [bank's] interests [and] of the [bank officer's] duties and obligations."

Of this court's previous cases addressing ESL disqualification for misconduct, I find *Poore v. City of Minden*[40] most pertinent and persuasive. There, a city employee obtained electrical and water services from his employer for a period of 10 years without paying for them. This court reviewed its own and other state courts' decisions regarding ESL disqualifications for misconduct connected with work. This court said that "general misconduct totally divorced from an employee's job or not in any way related to his or her employer" was not misconduct justifying denial of benefits.[41] To find no connection with employment, this court said, "overlooks the relationship existing between a governmental unit and its citizens."[42] This court added, "Toleration of such conduct by a governmental employee would reflect unfavorably upon the employer in the eyes of the public."[43] Here, that unfavorable reflection was the very harm the bank sought to prevent and the bank officer's posts caused.

I recognize that the bank is not a governmental body. But because of the public nature of the banking industry, the banking statutes have the effect of taking the banking industry out of private hands and placing it under state control.[44] Thus, it seems to me, the same concern of the government regarding its reputation in the eyes of the public applies to any publicly regulated bank.

The majority here focuses on minutiae and misses the bigger picture. It is true that the bank officer did not use the bank's equipment or post his comments from work. But the bank's policies made clear that its officers were subject to higher standards than other employees. The bank was entitled

---

[40] *Poore v. City of Minden*, 237 Neb. 78, 464 N.W.2d 791 (1991).

[41] *Id*. at 86, 464 N.W.2d at 796.

[42] *Id*. at 87, 464 N.W.2d at 796.

[43] *Id*.

[44] *In re Invol. Dissolution of Battle Creek State Bank*, 254 Neb. 120, 575 N.W.2d 356 (1998).

to demand that its officers regulate their behavior to protect the bank's reputation. This bank officer failed to do so, and his conduct harmed the bank's reputation. I would reverse the judgment of the district court and remand the cause with instructions to reverse the decision of the appeal tribunal and reinstate the 14-week disqualification.

Funke, J., joins in this dissent.